# IN THE UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | |
|---|---|
| American Electric Power Service Corporation, American Transmission Systems Incorporated, Dayton Power and Light Company, Duke Energy Business Services LLC, Duke Energy Kentucky, Inc., Duke Energy Ohio, Inc., Jersey Central Power & Light Company, Keystone Appalachian Transmission Company, Mid-Atlantic Interstate Transmission LLC, Monongahela Power Company, PPL Electric Utilities Corporation, The Potomac Edison Company, Trans-Allegheny Interstate Line Company, and Virginia Electric and Power Company d/b/a Dominion Energy Virginia, | No. 24-1361 |
| *Petitioners,* | |
| *v.* | |
| Federal Energy Regulatory Commission, | |
| *Respondent.* | |

## UNDERLYING DECISIONS FROM WHICH PETITION ARISES

In accordance with this Court's procedural order dated November 26, 2024, Petitioners, as listed in the caption, respectfully seek review of the following Orders of the Federal Energy Regulatory Commission:

1) *American Municipal Power, Inc., et al. v. PJM Interconnection, L.L.C., Order on Complaint and Section 206 Filing, and Establishing Paper Hearing Procedures*, Docket Nos. EL22-80-000, *et al.*, 188 FERC ¶ 61,055 (July 25, 2024) (July 2024 Order); and

2) *American Municipal Power, Inc., et al. v. PJM Interconnection, L.L.C., Notice of Denial of Rehearing by Operation of Law and Providing for Further Consideration*, Docket Nos. EL22-80-001, *et al.*, 188 FERC ¶ 62,155 (Sept. 26, 2024) (September 2024 Denial Notice).

FERC's Orders are attached as Exhibits A and B, respectively.

Respectfully submitted,

/s/ David M. Gossett

John Longstreth
Donald A. Kaplan
K&L Gates LLP
1601 K Street, NW
Washington, DC 20006
(202) 778-9000
john.longstreth@klgates.com
don.kaplan@klgates.com

Steven M. Nadel
*Senior Counsel*
PPL Services Corporation
645 Hamilton Street
Suite 601
Allentown, PA 18101
(610) 774-4775
SMNadel@pplweb.com
*Attorneys for PPL Electric
Utilities Corporation*

David M. Gossett
Michael Kunselman
Richard P. Sparling
Davis Wright Tremaine LLP
1301 K Street, NW
Suite 500 East
Washington, DC 20005
(202) 973-4200
davidgossett@dwt.com
michaelkunselman@dwt.com
ricksparling@dwt.com

Morgan E. Parke
*Associate General Counsel*
Amanda Parker
*FERC Attorney*
FirstEnergy Service Company
76 South Main Street A-GO-15
Akron, OH 44308
(330) 384-4595
mparke@firstenergycorp.com
aparker@firstenergycorp.com

*Attorneys for the FirstEnergy
Transmission Companies*[1]

---

[1] Petitioners American Transmission Systems, Incorporated, Jersey
Central Power & Light Company, Keystone Appalachian Transmission
Company, Mid-Atlantic Interstate Transmission LLC, Monongahela
Power Company, The Potomac Edison Company, and Trans-Allegheny
Interstate Line Company are collectively the "FirstEnergy
Transmission Companies."

Jessica Cano
*Assistant General Counsel-FERC*
American Electric Power Service
Corporation
1 Riverside Plaza
Columbus, OH 43215
(614) 716-2921
jacano@aep.com

*Attorney for American Electric
Power Service Corporation*

Molly Suda
*Associate General Counsel*
Duke Energy Corporation
1301 Pennsylvania Ave NW
Suite 200
Washington, DC 20004
(202) 824-8011
molly.suda@duke-energy.com
*Attorney for Duke Energy*[2]

William M. Rappolt
*Assistant General Counsel, FERC*
AES US Services, LLC
4300 Wilson Blvd
Arlington, VA 22203
(571) 533-9018
william.rappolt@aes.com

*Attorney for The Dayton Power
and Light Co. d/b/a AES Ohio*

Christopher R. Jones
Miles H. Kiger
Troutman Pepper Hamilton
Sanders LLP
401 9th Street, NW
Suite 1000
Washington, DC 20004
(202) 662-2181
Chris.Jones@troutman.com
Miles.Kiger@troutman.com

Cheri Yochelson
*Assistant General Counsel*
Dominion Energy Services, Inc.
120 Tredegar Street, RS-5
Richmond, VA 23219
(804) 819-2691
Cheri.M.Yochelson@dominion
energy.com

*Attorneys for Dominion Energy
Services, Inc. on behalf of Virginia
Electric and Power Company
d/b/a Dominion Energy Virginia*

Dated: December 26, 2024

---

[2] Petitioners Duke Energy Business Services LLC ("DEBS"), Duke Energy Kentucky, Inc. ("DEK"), and Duke Energy Ohio, Inc. ("DEO") are collectively "Duke Energy."

# CERTIFICATE OF SERVICE

I hereby certify that on December 26, 2024, I caused a true and correct copy of the foregoing Underlying Decisions from Which Petition Arises to be served on all parties via the Court's CM/ECF system.

Respectfully submitted,

<u>/s/ David M. Gossett</u>
David M. Gossett
Davis Wright Tremaine LLP
1301 K Street, NW
Suite 500 East
Washington, DC 20005
(202) 973-4200
davidgossett@dwt.com

*Attorney for the FirstEnergy*
*Transmission Companies*

**EXHIBIT A**

188 FERC ¶ 61,055
UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Before Commissioners:  Willie L. Phillips, Chairman;
                       Mark C. Christie, and David Rosner.

| | |
|---|---|
| American Municipal Power, Inc., Office of the People's<br>Counsel for the District of Columbia, and the PJM<br>Industrial Customer Coalition | Docket Nos.  EL22-80-000 |
| v. | |
| PJM Interconnection, L.L.C.; | EL22-85-000 |
| PJM Interconnection, L.L.C. | |

ORDER ON COMPLAINT AND SECTION 206 FILING, AND ESTABLISHING
PAPER HEARING PROCEDURES

(Issued July 25, 2024)

1.      On July 26, 2022, in Docket No. EL22-80-000, American Municipal Power, Inc.,
the Office of the People's Counsel for the District of Columbia, and the PJM Industrial
Customer Coalition (Complainants), pursuant to sections 206, 306, and 309 of the
Federal Power Act (FPA),[1] filed a complaint against PJM Interconnection, L.L.C. (PJM)
regarding PJM's implementation of its Regional Transmission Expansion Plan (RTEP)
process and associated requirements (Complaint).  Specifically, Complainants allege that
PJM has failed to execute Designated Entity Agreements with each entity designated to
construct a transmission project that PJM has selected as the more efficient or
cost-effective transmission project in its RTEP (Designated Entity),[2] in all instances
required by Schedule 6 of the Amended and Restated Operating Agreement of PJM
Interconnection, L.L.C. (Operating Agreement), regardless of whether that transmission

---

[1] 16 U.S.C. §§ 824e, 825e, 825h.

[2] "Designated Entity" shall mean an entity, including an existing Transmission
Owner or Nonincumbent Developer, designated by the Office of the Interconnection with
the responsibility to construct, own, operate, maintain, and finance Immediate-need
Reliability Projects, Short-term Projects, Long-lead Projects, or Economic-based
Enhancements or Expansions pursuant to Operating Agreement, Schedule 6,
section 1.5.8.  *See* PJM, Intra-PJM Tariffs, OA, Definitions, OA Definitions C - D
(28.2.0).

project is selected in the RTEP for purposes of cost allocation.[3]  On August 26, 2022, in Docket No. EL22-85-000, pursuant to sections 206, 306, and 309 of the FPA and Rule 206 of the Commission's Rules of Practice and Procedure,[4] PJM filed a request asking the Commission to revise Schedule 6, section 1.5.8 of the Operating Agreement, which governs PJM's RTEP process and associated requirements for Designated Entity Agreements (PJM 206 Filing).  Both the Complaint and the PJM 206 Filing raise issues regarding the interpretation of Schedule 6, section 1.5.8, that section's usage of the term "Designated Entity," and PJM's implementation of these provisions.

2.      As described below, we grant the Complaint, in part, and deny the Complaint, in part.  We also grant the PJM 206 Filing, in part, and deny the PJM 206 Filing, in part.  Additionally, we direct PJM to submit a compliance filing within 30 days of the date of issuance of this order.  Finally, we establish paper hearing procedures to develop a further record that we will use to determine PJM's going-forward responsibilities regarding Designated Entity Agreement requirements for certain in progress RTEP projects.

I.      **Background**

3.      In Order No. 1000, the Commission adopted a transmission planning framework that required public utility transmission providers to develop criteria and protocols to govern the submission and evaluation of proposals for transmission facilities to be evaluated in the regional transmission planning process.[5]  The Commission stated that "[t]o meet such requirements more efficiently and cost-effectively, the regional transmission plan must reflect a fair consideration of transmission facilities proposed by nonincumbents."[6]  The Commission clarified that "selected in a regional transmission plan for purposes of cost allocation" excludes a new transmission facility if the costs of that facility are borne entirely by the public utility transmission provider in whose retail distribution service territory or footprint that new transmission facility is to be located,

---

[3] This order refers collectively to these transmission projects as "RTEP projects."

[4] 18 C.F.R. § 385.206 (2023).

[5] *Transmission Planning & Cost Allocation by Transmission Owning & Operating Pub. Utils.*, Order No. 1000, 136 FERC ¶ 61,051, at P 225 (2011), *order on reh'g*, Order No. 1000-A, 139 FERC ¶ 61,132, *order on reh'g and clarification*, Order No. 1000-B, 141 FERC ¶ 61,044 (2012), *aff'd sub nom. S.C. Pub. Serv. Auth.* v. *FERC*, 762 F.3d 41 (D.C. Cir. 2014).

[6] Order No. 1000, 136 FERC ¶ 61,051 at P 11.

therefore, the competitive transmission development requirements of Order No. 1000 do not apply to such a facility.[7]

### A. PJM's Competitive Proposal Window Process under Schedule 6, Section 1.5.8

4.     To comply with Order No. 1000's regional transmission planning and cost allocation requirements, in 2013, PJM proposed revisions to its RTEP process. Specifically, PJM proposed including a competitive proposal window process under Schedule 6, section 1.5.8[8] through which an entity who is pre-qualified as eligible to be a Designated Entity (either an incumbent transmission owner or nonincumbent transmission developer[9]) may submit a project proposal and may notify PJM if it desires to be designated rights to the transmission project if the transmission project is selected for inclusion in the RTEP.[10]  PJM relies on this competitive proposal window process to evaluate and select the more efficient or cost-effective transmission project in its regional transmission plan for purposes of cost allocation,[11] and then identifies the Designated Entity that will construct, own, operate, maintain, and finance the selected transmission

---

[7] Order No. 1000-A, 139 FERC 61,132 at P 423.

[8] PJM, Intra-PJM Tariffs, OA Schedule 6 Sec 1.5, OA Schedule 6 Sec 1.5 Procedure for Development of the Regi (28.0.0), § 1.5.8, https://etariff.ferc.gov/TariffSectionDetails.aspx?tid=1731&sid=300495 (referred to throughout as OA Schedule 6 Sec. 1.5).

[9] Order No. 1000 defined a nonincumbent transmission developer as either:  (1) a transmission developer that does not have a retail distribution service territory or footprint; or (2) a public utility transmission provider that proposes a transmission project outside of its retail distribution service territory or footprint, where it is not the incumbent transmission owner for the purposes of that project.  Order No. 1000, 136 FERC ¶ 61,051 at P 225.

[10] *See PJM Interconnection, L.L.C.*, 142 FERC ¶ 61,214, at P 194 (2013) (PJM First Compliance Order), *order on reh'g and compliance*, 147 FERC ¶ 61,128 (2014) (PJM Second Compliance Order), *order on reh'g and compliance*, 150 FERC ¶ 61,038 (PJM Third Compliance Order), and *order on reh'g and compliance*, 151 FERC ¶ 61,250 (2015) (PJM Fourth Compliance Order).

[11] *See* PJM First Compliance Order, 147 FERC ¶ 61,128 at P 236.

project.[12]  The Commission found that PJM's revised RTEP process complies with Order No. 1000.[13]

## 1.     **PJM-Chosen Sponsored and PJM-Chosen Unsponsored Projects**

5.    As relevant here, through its RTEP process, PJM identifies regional transmission needs and opens competitive proposal windows to solicit project proposals that address those needs.  PJM describes three time-based categories of transmission projects[14] to address identified reliability transmission needs:[15]  Long-lead Projects,[16] Short-term

---

[12] *See PJM Interconnection, L.L.C.*, 164 FERC ¶ 61,021, at P 3 (2018) (2018 DEA Order), *order on reh'g and compliance*, 168 FERC ¶ 61,121 (2019) (2019 DEA Rehearing Order).

[13] *See supra* note 10.

[14] Schedule 6, section 1.5.8 of the Operating Agreement refers interchangeably to the projects proposed to address identified transmission needs in the PJM RTEP process as "projects" and "solutions".  For consistency, this order refers to these projects as "transmission projects."

[15] *See, e.g.*, *PJM Interconnection, L.L.C.*, 142 FERC ¶ 61,214 at P 194.  One additional category of transmission project is Economic-based Enhancements or Expansions, which address identified economic transmission needs via the competitive proposal window process.

[16] "Long-lead Project" shall mean a transmission enhancement or expansion with an in-service date more than five years from the year in which, pursuant to Operating Agreement, Schedule 6, section 1.5.8(c), the Office of the Interconnection posts the violations, system conditions, or Public Policy Requirements to be addressed by the enhancement or expansion.  *See* PJM, Intra-PJM Tariffs, OA, Definitions I-L, OA Definitions I – L (20.0.0); *see also* PJM, Intra-PJM Tariffs, OA Schedule 6 Sec 1.5 (28.0.0), § 1.5.8(c) (Project Proposal Windows).

Document Accession #: 20240725-3020          Filed Date: 07/25/2024

Projects,[17] and Immediate-need Reliability Projects.[18] PJM opens competitive proposal windows to address immediate reliability needs only when it is feasible to do so.[19] PJM's RTEP process has two additional categories of specific reliability violations for which PJM may, under certain circumstances, open a competitive proposal window: Reliability Violations on Transmission Facilities Below 200 kV[20] and Thermal Reliability Violations on Transmission Substation Equipment.[21]

---

[17] "Short-term Project" shall mean a transmission enhancement or expansion with an in-service date of more than three years but no more than five years from the year in which, pursuant to Operating Agreement, Schedule 6, section 1.5.8(c), the Office of the Interconnection posts the violations, system conditions, or Public Policy Requirements to be addressed by the enhancement or expansion. *See* PJM, Intra-PJM Tariffs, OA, S–T, OA Definitions S – T (22.0.0); *see also* PJM, Intra-PJM Tariffs, OA Schedule 6 Sec 1.5 (28.0.0), § 1.5.8(c) (Project Proposal Windows).

[18] "Immediate-need Reliability Project" shall mean a reliability-based transmission enhancement or expansion that the Office of the Interconnection has identified to resolve a need that must be addressed within three years or less from the year the Office of the Interconnection identified the existing or projected limitations on the Transmission System that gave rise to the need for such enhancement or expansion pursuant to the study process described in Operating Agreement, Schedule 6, section 1.5.3. *See* PJM, Intra-PJM Tariffs, OA, Definitions I-L, OA Definitions I – L (20.0.0); *see also* PJM, Intra-PJM Tariffs, OA, Schedule 6 Sec. 1.5 (28.0.0), § 1.5.8(c) (Project Proposal Windows).

[19] *See* PJM, Intra-PJM Tariffs, OA, Schedule 6 Sec. 1.5 (28.0.0), § 1.5.8 (m)(2) (Immediate-need Reliability Projects).

[20] *See PJM Interconnection, L.L.C.*, 156 FERC ¶ 61,132 at P 18 (2016) ("PJM states it intends that the process for planning transmission projects to address reliability violations on transmission facilities operating below 200 kV will interact with Schedule 6 of PJM's Operating Agreement the same as the process for planning Immediate-need Reliability Projects does."); *see also* PJM, Intra-PJM Tariffs, OA Schedule 6 Sec 1.5, (28.0.0), § 1.5.8(n) (Reliability Violations on Transmission Facilities Below 200 kV).

[21] *See PJM Interconnection, L.L.C.*, Deficiency Response, Docket No. ER16-1719-001, at 4 (filed Aug. 14, 2017) at 4 (stating that its proposal for Thermal Reliability Violations on Transmission Substation Equipment is modeled after the processes for Immediate-need Reliability Projects and the Reliability Violations on Transmission Facilities Below 200 kV, which were previously accepted by the Commission); *see also PJM Interconnection, L.L.C.*, Docket No. ER17-1619 (Oct. 11, 2017) (unpublished letter order); PJM, Intra-PJM Tariffs, OA, Schedule 6 Sec 1.5

6.      Once a competitive proposal window has closed, PJM analyzes the submitted transmission projects and then selects the more efficient or cost-effective transmission solution in its regional transmission plan for purposes of cost allocation.[22]  In this order, we refer to these projects as "PJM-chosen sponsored projects."

7.      As noted above, under Schedule 6, section 1.5.8, there are certain circumstances in which PJM does not open a competitive proposal window.  Instead, PJM itself identifies the more efficient or cost-effective transmission project to resolve an identified transmission need and selects that transmission project in the regional transmission plan for purposes of cost allocation.[23]  Specifically, these circumstances include:  (1) when PJM determines that none of the transmission projects proposed in a previous, closed competitive proposal window would be the more efficient or cost-effective transmission solution to resolve the transmission need;[24] (2) when PJM determines that it is not feasible to open a competitive proposal window for an Immediate-need Reliability Project;[25] and (3) for projects that do not require PJM to open a competitive proposal window for certain Reliability Violations on Transmission Facilities Below 200 kV or for certain Thermal Reliability Violations on Transmission Substation Equipment.[26]  In each of these circumstances, PJM is required to designate the incumbent transmission owner as the entity to construct, own, operate, maintain, and finance transmission projects

----

(28.0.0), § 1.5.8(p) (Thermal Reliability Violations on Transmission Substation Equipment).

[22] *See* PJM Interconnection, L.L.C., Intra-PJM Tariffs, OA, Schedule 6 Sec 1.5 (28.0.0), § 1.5.8(a)-(e); s*ee also id.* § 1.5.8(m)(2).

[23] *See* PJM, Intra-PJM Tariffs, OA, Schedule 6 Sec 1.5. (28.0.0), §§ 1.5.8(g)-(h), (m)(1), (n), (p).

[24] *See* PJM, Intra-PJM Tariffs, OA, Schedule 6 Sec 1.5 (28.0.0), § 1.5.8(g) (Procedures if No Long-lead Project or Economic-based Enhancement or Expansion Proposal is Determined to be the More Efficient or Cost-Effective Solution); *id.* § 1.5.8(h) (Procedures if No Short-term Project Proposal is Determined to be the More Efficient or Cost-Effective Solution).

[25] *See* PJM, Intra-PJM Tariffs, OA, Schedule 6 Sec 1.5 (28.0.0), § 1.5.8 (m)(1) (Immediate-need Reliability Projects).

[26] *See* PJM, Intra-PJM Tariffs, OA, Schedule 6 Sec 1.5 (28.0.0), §§ 1.5.8(n) (Reliability Violations on Transmission Facilities Below 200 kV) and (p) (Thermal Reliability Violations on Transmission Substation Equipment).

chosen by PJM for inclusion in the regional transmission plan.  In this order, we refer to
these projects as "PJM-chosen unsponsored projects."

### 2.    Cost Allocation

8.     For all PJM-chosen sponsored projects and PJM-chosen unsponsored projects that
PJM identifies as the more efficient or cost-effective transmission projects to resolve
identified transmission needs, PJM recommends those projects to the PJM Board of
Managers (PJM Board) for approval and selection in the RTEP for purposes of cost
allocation.  In its recommendation to the PJM Board, PJM includes the *ex ante* regional
cost allocation methods that would apply to each respective project if the PJM Board
approves PJM's recommendations.[27]  PJM's regional cost allocation methods are detailed
in Schedule 12 of the PJM OATT.[28]

### 3.    "Designated Entity" Designations

9.     For each PJM-chosen unsponsored project and PJM-chosen sponsored project,
PJM also identifies, for the PJM Board's approval, a Designated Entity that is responsible
for constructing, owning, operating, maintaining, and financing the project.  Throughout
PJM's governing documents, the term Designated Entity applies to both incumbent
transmission owners and nonincumbent transmission developers alike.[29]  Under
Schedule 6, section 1.5.8, PJM identifies the incumbent transmission owner in whose

---

[27] PJM, Intra-PJM Tariffs, OA, Schedule 6 Sec 1.6 (4.0.0), § 1.6(a) (Approval of
the Final Regional Transmission Expansion Plan) ("Based on the studies and analyses
performed by the Office of the Interconnection under Operating Agreement, Schedule 6,
the PJM Board shall approve the Regional Transmission Expansion Plan in accordance
with the requirements of Operating Agreement, Schedule 6.  The PJM Board shall
approve the cost allocations for transmission enhancements and expansions consistent
with Tariff, Schedule 12.  Supplemental Projects shall be integrated into the Regional
Transmission Expansion Plan approved by the PJM Board but shall not be included for
cost allocation purposes.").

[28] *See* PJM, Intra-PJM Tariffs, OATT, Schedule 12 (15.0.0)

[29] *See, e.g.*, PJM, Intra-PJM Tariffs, OA, Definitions (C - D), OA
Definitions C – D (32.0.0) ("'Designated Entity' shall mean an entity, *including an
existing Transmission Owner or Nonincumbent Developer . . .*" (emphasis added)); PJM,
Intra-PJM Tariffs, OA, Schedule 6 Sec 1.5 (28.0.0), § 1.5.8(j) (Acceptance of
Designation) ("Within 30 days of receiving notification of its designation as a Designated
Entity, *the existing Transmission Owner or Nonincumbent Developer* shall notify the
Office of the Interconnection of its acceptance of such designation . . ." (emphasis
added)).

zone the project is located as the Designated Entity for all PJM-chosen unsponsored projects. Under section 1.5.8(*l*), PJM must identify the incumbent transmission owner as the Designated Entity for certain PJM-chosen sponsored projects as well, (i.e., Transmission Owner Designated Projects) regardless of which transmission developer proposed the project.[30]  For all other PJM-chosen sponsored projects, PJM will often identify the entity who proposed the project as the Designated Entity, whether that entity is the incumbent transmission owner or nonincumbent transmission developer.[31]

10.     Within 15 business days of the PJM Board's approval of the RTEP, which includes transmission project selections, cost allocation determinations, and Designated Entity designations, PJM must provide notice to the entities that it has identified as the Designated Entity for each transmission project included in the RTEP, the needed in-service date for the project, and a date by which all necessary state approvals should be obtained.[32]  To accept its Designated Entity designation, the transmission developer must provide notice of its acceptance to PJM within 30 days of receiving notice of its designation.  The transmission developer must also provide PJM with a development schedule with the milestones necessary to develop and construct the selected transmission project by the needed in-service date.  After the transmission developer accepts its Designated Entity designation, PJM must, within 15 days of such acceptance, provide the Designated Entity with an executable Designated Entity Agreement setting forth the rights and obligations of the parties.[33]  Finally, within 60 days of receiving notification of

---

[30] Transmission Owner Designated Projects include a "Short-term Project or Long-lead Project [that is]:  (i) a Transmission Owner Upgrade; (ii) located solely within a Transmission Owner's Zone and the costs of the project are allocated solely to the Transmission Owner's Zone; (iii) located solely within a Transmission Owner's Zone and is not selected in the Regional Transmission Expansion Plan for purposes of cost allocation; or (iv) proposed to be located on a Transmission Owner's existing right of way and the project would alter the Transmission Owner's use and control of its existing right of way under state law."  PJM, Intra-PJM Tariffs, OA, Schedule 6, § 1.5.8(*l*) (Transmission Owners Required to be the Designated Entity) (28.0.0).

[31] PJM, Intra-PJM Tariffs, OA, Schedule 6 Sec 1.5 (28.0.0), § 1.5.8(f) (Entity-Specific Criteria Considered in Determining the Designated Entity for a Project).

[32] PJM, Intra-PJM Tariffs, OA, Schedule 6 Sec 1.5 (28.0.0), § 1.5.8(i) (Notification of Designation Entity).

[33] The Commission required PJM to submit any *pro forma* Designated Entity Agreement developed through its stakeholder process to the Commission for review. PJM First Compliance Order, 142 FERC ¶ 61,214 at P 280.  *See also PJM*

its designation, the Designated Entity must submit to PJM the executed Designated Entity Agreement and a letter of credit to cover the incremental costs of construction that would result if the selected transmission project was reassigned.[34]

11.     Attachment KK to the PJM Open Access Transmission Tariff (OATT) is PJM's Commission-approved *pro forma* Designated Entity Agreement.[35]  That agreement sets forth the rights and obligations between PJM and the Designated Entity that PJM designates, in accordance with Schedule 6, section 1.5.8(i) of the Operating Agreement, with the responsibility to construct, own, operate, maintain, and finance a project.  The *pro forma* Designated Entity Agreement includes terms and conditions related to project construction, including construction milestones, coordination with third parties, insurance, breach, and default, among others.  Relevant here, it also includes provisions, in accordance with section 1.5.8(j) of the Operating Agreement, that require the Designated Entity to provide security to PJM in an amount equal to 3% of the estimated cost of the project.[36]

## B.     **Subsequent PJM Proposals to Revise the Designated Entity Agreement Requirement**

12.     In the PJM Designated Entity Agreement Order, the Commission interpreted the Designated Entity Agreement, and all of its terms and conditions, as applying in full to all Designated Entities, including both incumbent transmission owners and nonincumbent transmission developers.[37]  Since then, the Commission has rejected two PJM filings, each of which sought, under certain circumstances, to exempt incumbent transmission owners from having to execute a Designated Entity Agreement when designated by PJM as the Designated Entity for an RTEP project selected by PJM as the more efficient or cost-effective solution in the regional transmission plan.

---

*Interconnection, L.L.C.*, 148 FERC ¶ 61,187 (2014) (PJM Designated Entity Agreement Order) (conditionally accepting the *pro forma* Designated Entity Order).

[34] PJM, Intra-PJM Tariffs, OA, Schedule 6 Sec 1.5 (28.0.0), § 1.5.8(j) (Acceptance of Designation).

[35] PJM, Intra-PJM Tariffs, OATT Attachment KK (0.1.0) (Form of Designated Entity Agreement).

[36] PJM, Intra-PJM Tariffs, OATT Attachment KK (0.1.0) (Form of Designated Entity Agreement) (referring to Article 3, section 3.0, entitled "Obligation to Provide Security").

[37] PJM Designated Entity Agreement Order, 148 FERC ¶ 61,187 at P 47.

13.     First, in July 2018, the Commission rejected as unjust, unreasonable, and unduly discriminatory or preferential PJM's FPA section 205 filing to exempt an incumbent transmission owner from having to execute a Designated Entity Agreement for Transmission Owner Designated Projects.[38]  PJM argued that the terms of the Consolidated Transmission Owners Agreement, to which all incumbent transmission owners are parties, are comparable to the terms of the Designated Entity Agreement.  The Commission disagreed.  The Commission explained that "[i]n order for similarly situated transmission developers to be treated comparably, . . . the terms of the agreement to which the incumbent [transmission] owner [is] subject should not be 'less stringent' than those contained in the designated development agreement" applicable to nonincumbent transmission developers.[39]  In August 2019, the Commission denied rehearing, explaining that where "both incumbent and nonincumbent transmission developers . . . are competing for the same opportunity subject to the same set of criteria, those developers should be subject to comparable rules for the entirety of that competitive process."[40]

14.     Second, in February 2022, the Commission rejected PJM's attempt to make a revised compliance filing in response to Order No. 1000 that would have specified that incumbent transmission owners are considered Designated Entities only for transmission projects that are included in the regional transmission plan *for purposes of cost allocation*, and therefore incumbent transmission owners would be required to execute a Designated Entity Agreement only for those projects.[41]  PJM argued that Order No. 1000 did not require competitive proposal windows unless the transmission project is selected in the regional transmission plan for purposes of cost allocation and, therefore, an incumbent transmission owner need not sign a Designated Entity Agreement for those projects whose costs are allocated 100% to the incumbent transmission owner.  The Commission rejected PJM's filing on procedural grounds, explaining that PJM had improperly filed revisions to its Operating Agreement as a compliance filing in response

---

[38] 2018 DEA Order, 164 FERC ¶ 61,021 at P 27.

[39] *Id.* at P 29-33.

[40] 2019 DEA Rehearing Order, 168 FERC ¶ 61,121 at P 19.  In addition, because "[e]xecution and implementation of the terms of a development agreement, here PJM's Designated Entity Agreement, are part of the processing of proposed transmission projects," the Commission considered "whether the terms of any agreement could result in undue discrimination 'both in seeking selection in the regional transmission plan for purposes of cost allocation and remaining selected.'"  *Id.* (quoting *New York Indep. Sys. Operator, Inc.*, 162 FERC ¶ 61,124, at P 12 (2018) (NYISO 2018 Order)).

[41] 2022 Rejection Order, 178 FERC ¶ 61,083 at PP 1, 5.

to an order that was final and required no compliance.[42]  The Commission explained that, because PJM's proposed revisions would have changed the filed rate, PJM must file its proposed revisions in a separate docket under FPA section 205[43] (or section 206, if appropriate) and meet the requisite evidentiary burden.[44]

## II.    Overview of Filings

### A.    Complaint

15.    Complainants argue that, under the Operating Agreement, each Designated Entity designated to build an RTEP project approved pursuant to Schedule 6, section 1.5.8 must execute a Designated Entity Agreement.[45]  Complainants argue that the requirement to execute a Designated Entity Agreement explicitly applies to both incumbent transmission owners and nonincumbent transmission developers, and to all projects included in the RTEP, whether or not the project is selected in the regional transmission plan for purposes of cost allocation, and whether or not the project is chosen through a competitive proposal window, i.e., whether the project is a PJM-chosen sponsored project or a PJM-chosen unsponsored project.[46]

16.    Complainants allege that PJM has failed, however, to execute a Designated Entity Agreement with each Designated Entity in all instances required by the Operating Agreement.  Instead, according to Complainants, PJM has executed only a handful of Designated Entity Agreements with Designated Entities despite having approved "hundreds" of RTEP projects pursuant to Schedule 6, section 1.5.8.[47]

17.    Complainants contend that neither practice fully complies with the Operating Agreement.[48]  In turn, Complainants request that the Commission immediately direct PJM to comply with the Operating Agreement's requirement that Designated Entities, including both incumbent transmission owners and nonincumbent transmission

---

[42] *Id.* at PP 25-31.

[43] 16 U.S.C. § 824d.

[44] 2022 Rejection Order, 178 FERC ¶ 61,083 at PP 27, 30.

[45] Complaint at 3-4.

[46] *Id.* at 3-4.

[47] *See id.* at 1-5, 12-13, 21.

[48] *Id.* at 18; *see also id.* at 2-3.

developers, execute a Designated Entity Agreement.[49]  Specifically, Complainants request that the Commission require PJM to:  (1) execute Designated Entity Agreements with transmission developers for all previously approved RTEP projects that are under construction (i.e., facilities not yet in service), whether or not those projects have been selected in the RTEP for purposes of cost allocation; and, (2) execute Designated Entity Agreements for all RTEP projects going forward.[50]

## B.    PJM 206 Filing

18.    In the PJM 206 Filing, PJM asserts that "overly broad and imprecise" use of the defined term "Designated Entity" in Schedule 6, section 1.5.8 renders the Operating Agreement unjust and unreasonable.[51]  PJM contends that this imprecise and overly broad usage of the term "Designated Entity" creates ambiguity in section 1.5.8 and the definition of "Designated Entity," which in turn severely hinders PJM's ability to implement section 1.5.8.[52]  Accordingly, PJM requests that the Commission find portions of the Operating Agreement unjust and unreasonable under FPA section 206 and adopt PJM's proposed replacement rate provisions, which PJM contends would align the Operating Agreement language with the scope of Order No. 1000's reforms, resolve ambiguities, and eliminate conflicting interpretations.[53]

## III.   Notice, Interventions, and Responsive Pleadings

19.    Notice of the Complaint in Docket No. EL22-80-000 was published in the *Federal Register*, 87 Fed. Reg. 47,418 (Aug. 3, 2022), with interventions and protests due on or before August 29, 2022.[54]

---

[49] *Id.* at 3, 24.  Complainants further argue that while PJM stakeholder processes could address Designated Entity Agreement issues, unless and until there are changes to the Operating Agreement, PJM must comply with its existing requirements.  *Id.* at 22. Complainants assert that there should be no disputed facts and that they seek only enforcement of the existing filed rate.  *Id.* at 25.

[50] *See id.* at 3, 25.

[51] PJM 206 Filing at 1-2, 14-15.

[52] *Id.* at 2.

[53] *Id.* at 1, 2, 37-38.

[54] On August 9, 2022, the Commission issued a notice of extension of time to extend the comment deadline from August 15, 2022, to August 29, 2022.

20.     Notice of the PJM 206 Filing in Docket No. EL22-85-000 was published in the *Federal Register*, 87 Fed. Reg. 54,686 (Sept. 7, 2022), with interventions and protests due on or before September 15, 2022.

21.     Timely motions to intervene in both Docket No. EL22-80-000 and Docket No. EL22-85-000 were filed by: American Electric Power Service Corporation (AEP),[55] Constellation Energy Generation, LLC, Dayton Power and Light Company, Delaware Division of the Public Advocate, Dominion Energy Services, Inc. (Dominion Energy),[56] Duke Energy Corporation (Duke Energy),[57] Duquesne Light Company, Exelon Corporation, FirstEnergy Service Company (FirstEnergy),[58] LSP Transmission Holdings II, LLC (LSP Transmission), Monitoring Analytics, LLC, acting in its capacity as the independent market monitor for PJM, the New Jersey Division of Rate Counsel, the Ohio Federal Energy Advocate, Old Dominion Electric Cooperative, PPL Electric Utilities Corporation, Public Citizen, Inc., and Rockland Electric Company. The New Jersey Board of Public Utilities filed a notice of intervention in both proceedings.

22.     Timely motions to intervene in Docket No. EL22-80-000 were filed by Buckeye Power, Inc., Calpine Corporation, East Kentucky Power Cooperative, Inc., the Organization of PJM States, Inc. (OPSI), and the Solar Energy Industries Association. The Public Service Commission of the District of Columbia and the Kentucky Public Service Commission filed notices of intervention in Docket No. EL22-80-000.

23.     Timely motions to intervene in Docket No. EL22-85-000 were filed by American Municipal Power, Inc., Delaware Municipal Electric Corporation, Inc., the Office of the

---

[55] AEP intervened on behalf of its affiliates, Appalachian Power Company, Indiana Michigan Power Company, Kentucky Power Company, Kingsport Power Company, Ohio Power Company, Wheeling Power Company, AEP Appalachian Transmission Company, Inc., AEP Indiana Michigan Transmission Company, Inc., AEP Kentucky Transmission Company, Inc., AEP Ohio Transmission Company, Inc., and AEP West Virginia Transmission Company, Inc.

[56] Dominion Energy intervened on behalf of Virginia Electric and Power Company.

[57] Duke Energy intervened on behalf of its franchised public utility affiliates, Duke Energy Ohio, Inc., Duke Energy Kentucky, Inc., Duke Energy Indiana, LLC, Duke Energy Carolinas, LLC, and Duke Energy Progress, LLC.

[58] FirstEnergy intervened as agent for its affiliates American Transmission Systems, Inc., Jersey Central Power & Light Company, Mid-Atlantic Interstate Transmission LLC, West Penn Power Company, The Potomac Edison Company, Monongahela Power Company, and Trans-Allegheny Interstate Line Company.

People's Counsel for the District of Columbia, the North Carolina Electric Membership Corporation, and the PJM Industrial Customer Coalition.

24.     On August 30, 2022, Public Service Electric and Gas Company and Delaware Municipal Electric Corporation, Inc. filed motions to intervene out-of-time in Docket No. EL22-80-000.  On September 16, 2022, Southern Maryland Electric Cooperative, Inc. filed a motion to intervene out-of-time in Docket No. EL22-85-000.  On August 30, 2022, in Docket No. EL22-80-000, and on September 16, 2022, in Docket No. EL22-85-000, the Data Center Coalition filed motions to intervene out-of-time and comments.

25.     On August 29, 2022, PJM filed an answer in Docket No. EL22-80-000 (PJM Answer to Complaint).  On September 15, 2022, Complainants and LSP Transmission (Joint Protestors) filed a joint protest, motion to consolidate, motion for leave to answer and answer (Joint Protest) in both Docket No. EL22-80-000 and Docket No. EL22-85-000.  Indicated PJM Transmission Owners (ITOs)[59] filed comments in both Docket No. EL22-80-000 and Docket No. EL22-85-000, and LSP Transmission and OPSI filed comments in Docket No. EL22-80-000.  On October 11, 2022, PJM filed a motion for leave to answer and answer (PJM Second Answer) in both Docket No. EL22-80-000 and Docket No. EL22-85-000.

---

[59] ITOs include:  American Electric Power Service Corporation on behalf of its affiliates, Appalachian Power Company, Indiana Michigan Power Company, Kentucky Power Company, Kingsport Power Company, Ohio Power Company, Wheeling Power Company, AEP Appalachian Transmission Company, Inc., AEP Indiana Michigan Transmission Company, Inc., AEP Kentucky Transmission Company, Inc., AEP Ohio Transmission Company, Inc., and AEP West Virginia Transmission Company, Inc. (collectively, AEP); The Dayton Power and Light Company; Duke Energy Corporation on behalf of its affiliates Duke Energy Ohio, Inc., Duke Energy Kentucky, Inc., and Duke Energy Business Services LLC; Duquesne Light Company; East Kentucky Power Cooperative, Inc.; Exelon Corporation; The FirstEnergy Transmission Companies, including American Transmission Systems, Incorporated, Jersey Central Power & Light Company, Mid-Atlantic Interstate Transmission LLC, West Penn Power Company, The Potomac Edison Company, Monongahela Power Company, and Trans-Allegheny Interstate Line Company; PPL Electric Utilities Corporation; Public Service Electric and Gas Company; Rockland Electric Company; UGI Utilities Inc.; and Virginia Electric and Power Company.

IV.    **Discussion**

    A.    **Procedural Matters**

26.    Pursuant to Rule 214 of the Commission's Rules of Practice and Procedure, 18 C.F.R. § 385.214 (2023), the notices of intervention and timely, unopposed motions to intervene serve to make the entities that filed them parties to this proceeding.

27.    Pursuant to Rule 214(d) of the Commission's Rules of Practice and Procedure, 18 C.F.R. § 385.214(d), we grant Public Service Electric and Gas Company's, Delaware Municipal Electric Corporation, Inc.'s, and Southern Maryland Electric Cooperative, Inc.'s late-filed motions to intervene given their interests in these proceedings, the early stage of these proceedings, and the absence of undue prejudice or delay.[60]

28.    Rule 213(a)(2) of the Commission's Rules of Practice and Procedure, 18 C.F.R. § 385.213(a)(2) (2023), prohibits an answer to a protest or an answer unless otherwise ordered by the decisional authority.  We accept PJM's and Joint Protestors' answers because they provided information that assisted us in our decision-making process.

29.    With respect to Joint Protestors' motion to consolidate,[61] we find consolidation to be unnecessary because the paper hearing that we establish primarily relates to our

---

[60] *See* 18 C.F.R. § 385.214(d)(1); *ISO New England Inc.*, 171 FERC ¶ 61,235, at P 30 (2020).  The Commission's regulations provide that timely motions to intervene must be filed within the time prescribed by the Commission's notice of the proceeding for filing interventions and protests.  18 C.F.R. § 385.210(b) (2023).  Here, the initial comment notices in these proceedings specified that comments were due by the Commission's 5 p.m. Eastern time filing deadline on August 15, 2022 (Docket No. EL22-80-000, later extended to August 29, 2022) and September 15, 2022 (Docket No. EL22-85-000); *see also Filing Via the Internet; Electronic Tariff Filings Notice of Display of Time on Commission's Electronic Filing System*, 75 Fed. Reg. 38,805 (July 6, 2010) (noting the Commission's 5 p.m. Eastern time deadline for filing).  For Data Center Coalition's motions to intervene, however, the Commission's public eLibrary database lists a "First Received Date" of "08/29/2022 06:22:48 PM" and a "Filed" date of "08/30/2022" in Docket No. EL22-80-000 and a "First Received Date" of "09/15/2022 05:48:21 PM" and a "Filed" date of "09/16/2022" in Docket No. EL22-85-000.  We take this opportunity to remind filers that under the Commission's regulations, "[d]ocuments received after regular business hours are deemed to have been filed on the next regular business day." 18 C.F.R. § 375.105(c) (2023).

[61] *See* American Municipal Power, Inc. et al., Joint Protest, Motion to Consolidate, Motion for Leave to Answer, and Answer at 3-4, Docket Nos. EL22-80-000 and EL22-85-000 (filed Sept. 15, 2022) (Joint Protest, Docket Nos. EL22-80-00 and EL22-85-000).  Conversely, ITOs request that the Commission hold Docket

finding that PJM has violated its Operating Agreement, i.e. the issue raised by the Complaint in Docket No. EL22-80-000, and not to whether the Operating Agreement is unjust, unreasonable, or unduly discriminatory, i.e. the issue raised by the PJM 206 Filing in Docket No. EL22-85-000.  Accordingly, we deny Joint Protestors' motion.

## B.   Substantive Issues

### 1.   Scope of PJM RTEP Projects Subject to Operating Agreement's Designated Entity Agreement Requirements

30.     Below, we summarize arguments in the Complaint, PJM 206 Filing, and both dockets' pleadings that address the scope of RTEP projects subject to the Designated Entity Agreement requirements in Schedule 6 of the currently-effective Operating Agreement.

#### a.   Filings

##### i.   Complaint (Docket No. EL22-80-000)

31.     Complainants allege that PJM has failed to execute a Designated Entity Agreement with Designated Entities in all instances required by Schedule 6, section 1.5.8 of the Operating Agreement.  Complainants argue that each Designated Entity, whether an incumbent transmission owner or nonincumbent transmission developer, designated to build an RTEP project approved pursuant to section 1.5.8 must execute a Designated Entity Agreement.  Complainants argue further that this requirement applies regardless of whether the project is chosen through a competitive proposal window or whether the project is selected in the regional transmission plan for purposes of cost allocation.[62] Complainants contend that PJM has not historically issued Designated Entity Agreements to incumbent transmission owners for RTEP projects that were exempt from competitive proposal window processes or whose costs were not regionally allocated.[63]  At present, Complainants contend that PJM still does not require a Designated Entity Agreement for

---

No. EL22-80-000 in abeyance pending resolution of PJM's filing in Docket No. EL22-85-000, and request that the Commission deny the Complaint's request for fast-track processing.  *See* ITOs Comments on Complaint, Docket No. EL22-80-000, at 5, 23-26.

[62] Complaint at 3-4.  Complainants further argue that the requirement to execute a Designated Entity Agreement specifically applies to Immediate-need Reliability Projects approved through Schedule 6, section 1.5.8(m)(1).  *Id.* at 4.

[63] *See id.* at 2, 21 (citations omitted).

projects that do not go through competitive proposal window processes.[64]  Moreover, rather than comply with the Operating Agreement, Complainants argue that PJM has repeatedly tried through various avenues and filings to change it.[65]

32.     Complainants argue that PJM, in carrying out its responsibilities, misreads the Operating Agreement, which, in Complainants' interpretation, contains no ambiguity about when and for which projects a transmission developer must execute a Designated Entity Agreement.[66]  Complainants contend that every transmission developer must execute a Designated Entity Agreement when it qualifies as a Designated Entity under the Operating Agreement's definition of such, i.e., when designated as responsible "to construct, own, operate, maintain, and finance Immediate-need Reliability Projects, Short-term Projects, Long-lead Projects, or Economic-based Enhancements or Expansions."[67]

33.     Complainants contend that there are no carve-outs or alternative processes in Schedule 6, section 1.5.8(j) for different types of projects designated to incumbent transmission owners who are parties to PJM's Consolidated Transmission Owners Agreement.[68]  That is, regardless of whether a transmission developer is an incumbent transmission owner or a nonincumbent transmission developer, Complainants contend that Designated Entity Agreements are required for all RTEP projects approved pursuant to section 1.5.8.[69]  Complainants argue that PJM has tried to "informally create a distinction" between what PJM views as "Order No. 1000 Projects" (i.e., projects that are selected through an open competitive proposal window *and* receive regional cost allocation), and "non-Order No. 1000 projects" (i.e., projects not chosen through a competitive proposal window, or chosen through a competitive proposal window but

---

[64] *See id.* at 2-3.

[65] *See* Complaint at 4-5 & nn.13-16, 13-15 (citing in part 2018 DEA Order, 164 FERC ¶ 61,021 at PP 1 n.6, 35; 2022 Rejection Order, 178 FERC ¶ 61,083 at P 1).

[66] *See* Complaint at 15-16.

[67] *Id.* at 16 (citation omitted); *see also supra* note 32 (providing the Operating Agreement's definition of Designated Entity).

[68] *See id.* at 17 (citing PJM, Intra-PJM Tariffs, OA, Schedule 6 Sec 1.5 (28.0.0), § 1.5.8(j) (Acceptance of Designation), *id.* § 1.5.8(*l*) (Transmission Owners Required to be the Designated Entity), *id.* § 1.5.8(m)(1) (Immediate-need Reliability Projects), *id.* § 1.5.8(n) (Reliability Violations on Transmission Facilities Below 200 kV), and *id.* § 1.5.8(p) Thermal Reliability Violations on Transmission Substation Equipment)).

[69] *See* Complaint at 15-16, 17-18

whose costs are allocated solely to the PJM zone where the project is located).[70] Complainants argue, however, that such distinctions do not exist in the Operating Agreement's project categories or definitions, or in the Operating Agreement's definition of Designated Entity.[71]  Because these Operating Agreement provisions and definitions comprise the filed rate governing PJM's RTEP, Complainants argue that PJM must adhere to them.[72]

34.     Complainants additionally argue that PJM's Order No. 1000 compliance filings confirm that all Designated Entities are required to execute a Designated Entity Agreement.[73]  Citing PJM's first Order No. 1000 compliance filing in Docket No. ER13-198-000, Complainants argue that the Operating Agreement recognizes that incumbent transmission owners are Designated Entities subject to a Designated Entity Agreement, even where the Designated Entity is the default entity designated to develop and build a project outside of a competitive proposal window process.[74]  Citing PJM's second Order No. 1000 compliance filing in Docket No. ER13-198-002, Complainants argue that the Operating Agreement requires both incumbent transmission owners and nonincumbent transmission developers to execute a Designated Entity Agreement if chosen as a Designated Entity.[75]  These compliance filings, Complainants contend, show

---

[70] *Id.* at 17 (citation omitted).

[71] Complainants state that the definition of Designated Entity includes "an entity, including an existing Transmission Owner or Nonincumbent Developer, designated by [PJM] with the responsibility to construct, own, operate, maintain, and finance Immediate-need Reliability Projects, Short-term Projects, Long-lead Projects, or Economic-based Enhancements or Expansions." Complaint at 17-18 (citing PJM, Intra-PJM Tariffs, OA, Definitions, OA Definitions C – D (28.2.0)).

[72] Complaint at 18; *see also id.* at 2-3.

[73] *Id.* at 18-19.

[74] *See id.* at 18-19 (citing PJM, Compliance Filing, Docket No. ER13-198-000, at 70-71 (filed Oct. 25, 2012) (First PJM Order No. 1000 Compliance Filing) ("[PJM would] designate the *Transmission Owner(s) in the Zone(s) where the project is located* to be the Designated Entity.") (emphasis added)).

[75] *See* Complaint at 19 (citing PJM, Compliance Filing, Docket No. ER13-198-002, at 44-45 (filed July 22, 2013) (Second PJM Order No. 1000 Compliance Filing) ("In the [First PJM Compliance Order], the Commission interpreted the requirement in section 1.5.8(j) for a Designated Entity to submit an executed agreement to PJM 'within 60 days of receiving notification of its designation as

that PJM did not include in the Designated Entity Agreement requirements that it filed with the Commission the limitations that Complainants allege PJM is now applying in practice.[76]

## ii.     Responsive Pleadings to Complaint

35.     In its answer, PJM argues that the competitive proposal window process in Schedule 6, section 1.5.8 was submitted in compliance with Order No. 1000, and that, consistent with Order No. 1000, Designated Entity Agreements are required only for projects chosen in the competitive proposal window process and that have costs allocated to more than one zone.  PJM states that, since the Commission approved section 1.5.8, PJM has not expanded section 1.5.8's meaning to encompass more than its "historic roots and original intent."[77]  PJM asserts that Complainants are seeking a Commission order "re-interpreting" section 1.5.8's language in a manner inconsistent with PJM's course of conduct since 2014.

36.     PJM states that it recognizes that Schedule 6, section 1.5.8's provisions are not drafted as clearly as they could have been.  PJM asserts that there is no basis, however, for a finding that PJM has violated the Operating Agreement.  Rather, contrary to Complainants' assertions, PJM contends that the Operating Agreement is, at worst, ambiguous and therefore susceptible to an interpretation that is at odds with its "regulatory context, PJM's stated intent at the time of its compliance filings, and PJM's subsequent course of conduct."  PJM further contends that, rather than acknowledging this ambiguity, Complainants unfairly request that the Commission suddenly find that the language is clear and direct PJM to enforce Complainants' preferred interpretation without considering other interpretations or the feasibility and ultimate cost to customers of that preferred interpretation.

37.     PJM also asserts that Complainants make a poor showing in support of their contention that Schedule 6, section 1.5.8 is not ambiguous.  PJM states that Complainants do not engage with the actual text of the relevant provisions.  PJM asserts that a proper textual analysis clearly demonstrates that there are ambiguities in section 1.5.8, despite Complainants contrary claims.[78]  PJM further contends that a proper interpretation

---

Designated Entity to apply equally to incumbent transmission developers.'  This interpretation is correct.")).

[76] Complaint at 19.

[77] PJM Answer to Complaint, Docket No. EL22-80-000, at 1-2.

[78] *Id.* at 5-6.

exercise looks at all relevant parts of an agreement.[79]  According to PJM, the Designated
Entity Agreement is unambiguous in that it applies only "in accordance with . . . Order
No. 1000,"[80] which, PJM states, Complainants do not contest.  This contradiction,
according to PJM, underscores the ambiguities present in section 1.5.8.[81]

38.     PJM states that stakeholders were unwilling to revise the Operating Agreement in
a timely manner and that the Commission rejected, on procedural grounds, PJM's
attempt to remove ambiguities through an "updated compliance filing."  Consequently, PJM
asserts that its only choice was to file the PJM 206 Filing requesting that the Commission
remove the ambiguities in section 1.5.8 and "Designated Entity" definition.  PJM further
asserts that granting the PJM 206 Filing's requested relief would moot the Complaint,
because, through the PJM 206 Filing, PJM is addressing the ambiguity by asking the
Commission to approve a just and reasonable replacement rate that is consistent with
PJM's original intent, and that PJM can effectively implement.  Therefore, PJM requests
that the Commission address these issues through action on the PJM 206 Filing.[82]

39.     According to PJM, at the heart of the Complaint and the PJM 206 Filing is the
question that PJM asserts the Commission left unresolved in the 2018 DEA Order:
whether transmission developers for projects that are not selected in the RTEP for
purposes of cost allocation are similarly situated to transmission developers for projects
that are selected in the RTEP for purposes of cost allocation, and therefore, whether
transmission developers for projects that are not selected in the RTEP for purposes of
cost allocation must execute a Designated Entity Agreement.

40.     Agreeing with Complainants, OPSI states that it believes that the Operating
Agreement's Designated Entity requirements are clear and that a Designated Entity
Agreement must be executed for all non-local projects included in PJM's RTEP.[83]  OPSI

---

[79] *Id.* at 6 (citing several cases for the proposition that a document should be read
to give effect to all of its provisions).

[80] *Id.* (citing PJM, Intra-PJM Tariffs, OATT Attachment KK (0.1.0) (Form of
Designated Entity Agreement) (first "whereas" clause of the *pro forma* Designated Entity
Agreement)).

[81] PJM Answer to Complaint, Docket No. EL22-80-000, at 6.  PJM states that the
PJM 206 Filing also demonstrates the ambiguity in section 1.5.8 (citing PJM 206 Filing
at 17-20).

[82] PJM Answer to Complaint, Docket No. EL22-80-000, at 1-3.  See also PJM 206
Filing at 14, 17-20 for similar arguments.

[83] OPSI Comments on Complaint, Docket No. EL22-80-000, at 4.

contends that the term "Designated Entity" encompasses both incumbent transmission owners and nonincumbent transmission developers, and that both types of entities must execute Designated Entity Agreements under the Operating Agreement.[84]  OPSI urges the Commission to ensure that PJM accurately interprets its Operating Agreement so that consumers can benefit from the important protections that Designated Entity Agreements provide.[85]

41.     LSP Transmission also supports the Complaint and agrees that the Operating Agreement unambiguously requires a Designated Entity Agreement for every RTEP project, including those designated to incumbent transmission owners outside of a competitive proposal window.[86]  LSP Transmission contends that the Designated Entity Agreement requirements ensure that PJM has the ability to hold a developer constructing a regionally planned project accountable, which includes an incumbent transmission owner, and thus Designated Entity Agreement requirements are not "just about new entrants and competition."[87]  LSP Transmission states that it has spent several years urging PJM to comply with LSP Transmission, consumer groups, and other stakeholders' view of what the Operating Agreement requires.[88]  LSP Transmission contends that PJM's ability to track a transmission developer's progress on a project using Designated Entity Agreements is especially important for Immediate-need Reliability Projects, for which PJM does not hold a competitive proposal window because PJM has deemed the

---

[84] *Id.* (citing PJM, Intra-PJM Tariffs, OA, Schedule 6 Sec 1.5 (28.0.0), § 1.5.8(j) (Acceptance of Designation)).

[85] OPSI Comments on Complaint, Docket No. EL22-80-000, at 3; *see also id.* (arguing that reevaluation, project milestones, breach, and security requirements are consumer protections required by a Designated Entity Agreement); LSP Transmission Comments on Complaint, Docket No. EL22-80-000, at 2, 3-4, (agreeing with OPSI that Designated Entity Agreements provide important consumer protections).

[86] LSP Transmission Comments on Complaint, Docket No. EL22-80-000, at 1-2.

[87] *See id.* at 2 n.6 (citing Order No. 1000, 136 FERC ¶ 61,051 at P 329).  Because a Designated Entity Agreement sets out specific project development milestones that, if missed, are considered a breach of contract, LSP Transmission argues that these requirements put PJM in control of tracking a transmission developer's progress and can lead to consideration of alternatives, including whether to cancel or reassign the project. *Id.* at 4.  LSP Transmission further asserts that there are no equivalent requirements in any other governing tariff or agreement.  *Id.* (citations omitted).

[88] LSP Transmission Comments on Complaint, Docket No. EL22-80-000, at 2-3.

projects to be so time-sensitive.[89]  When such projects are delayed, LSP Transmission contends that PJM needs to be "firmly in control of all the options" that PJM may need in order to respond.  If a Designated Entity Agreement is in place, LSP Transmission argues that PJM "can rely on a breach of project milestones, not just a violation of the Consolidated Transmission Owners Agreement."[90]

42.     ITOs argue that the Commission should deny the Complaint, reasoning that it is just and reasonable for PJM to not issue Designated Entity Agreements for all projects planned pursuant to Schedule 6, section 1.5.8.[91]  ITOs contend that the Complaint construes Designated Entity Agreement requirements too broadly, and Complainants' interpretation of the Operating Agreement would require Designated Entity Agreements even for projects selected outside of a competitive window process, for which there is no reasonable basis to require an agreement that ensures non-discriminatory treatment of similarly situated entities.[92]

43.     ITOs assert that Schedule 6's provisions were never meant to require Designated Entity Agreements for projects that do not result from a competitive proposal window, or that are not selected in the regional transmission plan for purposes of cost allocation.[93]  ITOs assert that PJM added Schedule 6's provisions so that PJM would have the means to memorialize the rights and obligations of the entities who are designated to construct projects selected through the competitive process for regional cost allocation, but who are not eligible to execute the Consolidated Transmission Owners Agreement.[94]  ITOs further

---

[89] *Id.* at 4.

[90] *Id.* at 5; *see also id.* (contending that if PJM had executed a Designated Entity Agreement for delayed Immediate-need Reliability Projects, then PJM would be required to reevaluate whether the current project remains the more efficient or cost-effective solution, or whether there are alternatives that could be constructed sooner).

[91] ITOs Comments on Complaint, Docket No. EL22-80-000, at 2.

[92] *Id.* at 2-3 & n.4; *see also id.* at 6 (citing PJM, Intra-PJM Tariffs, OA, Schedule 6 Sec 1.5 (28.0.0), § 1.5.8(m)(1) (Immediate-need Reliability Projects), *id.* § 1.5.8(n) (Reliability Violations on Transmission Facilities Below 200 kV), and *id.* § 1.5.8(p) (Thermal Reliability Violations on Transmission Substation Equipment).

[93] ITOs Comments on Complaint, Docket No. EL22-80-000, at 3; ITOs Comments on PJM 206 Filing at 3, 5-7.

[94] ITOs Comments on Complaint, Docket No. EL22-80-000, at 3-4, 9; ITOs Comments on PJM 206 Filing at 2 (describing a Designated Entity Agreement as a

argue that because the Commission's Designated Entity Agreement-related directives were made within the context of qualification and selection of projects in the regional transmission plan for purposes of cost allocation, these directives do not apply to projects selected outside of a competitive proposal process.[95] ITO's contend that the Commission's directive for Schedule 6 is to "treat like entities alike, which PJM is doing."[96]  ITOs argue that neither PJM's 2018 filing, PJM's 2022 filing, nor the resulting Commission orders support Complainants' claims, and the 2018 DEA Order sought to ensure comparable rules for competitive processes, not universal rules for all RTEP projects.[97]

44.    ITOs also contend that the Complaint's reasoning is flawed because Schedule 6, section 1.5.8 does not clearly specify to which projects the Designated Entity Agreement requirements apply.[98]  Specifically, ITOs note that section 1.5.8(m)(2) references a Designated Entity's acceptance of designation under section 1.5.8(j), while section 1.5.8(m)(1) does not.[99]  ITOs further argue that section 1.5.8(n) and section 1.5.8(p) do not use the term Designated Entity or reference subsection (j), and thus Designated Entity Agreement requirements do not apply to projects governed by those sections.[100]  ITOs argue that other Schedule 6 sections, including sections 1.6(b) and 1.7(c), distinguish between the terms Transmission Owner(s) and Designated Entities,

---

"bridge" agreement that spans the time between project designation and project completion for a nonincumbent transmission developer).

    [95] *See* ITOs Comments on Complaint, Docket No. EL22-80-000, at 9-11; *see also id.* at 16-17.

    [96] *See* ITOs Comments on Complaint, Docket No. EL22-80-000, at 10-12.

    [97] *Id.* at 12-16 (citations omitted); *see also* ITOs Comments on PJM 206 Filing at 9-11 (citations omitted); *id.* at 19 (arguing that PJM's proposed replacement rate is fully consistent with the 2018 DEA Order and 2019 Rehearing Order).

    [98] *See* ITOs Comments on Complaint, Docket No. EL22-80-000, at 4.

    [99] *See id.* at 16-17; ITOs Comments on PJM 206 Filing, Docket No. EL22-85-000, at 13-14.

    [100] ITOs Comments on Complaint, Docket No. EL22-80-000, at 17; ITOs Comments on PJM 206 Filing, Docket No. EL22-85-000, at 14.

contrary to the Complaint's contentions that incumbent Transmission Owners must be treated as Designated Entities for all RTEP projects.[101]

45.     ITOs argue that Complainants are asking the Commission to drastically expand Designated Entity Agreement-related requirements so that they apply to hundreds of additional projects, even though there is no precedent to support applying Designated Entity Agreement-related requirements to projects not subject to Order No. 1000 competitive processes.[102]  Echoing PJM's arguments, ITOs assert that Order No. 1000 distinguishes between transmission facilities selected pursuant to a regional transmission planning process for purposes of cost allocation and facilities that are not, a distinction that ITOs assert is an essential component of Order No. 1000.[103]

### iii.     PJM 206 Filing (Docket No. EL22-85-000)

46.     PJM asserts that Schedule 6, section 1.5.8's use of the defined term Designated Entity is "overly broad and imprecise."  PJM contends that this imprecise and overly broad usage makes section 1.5.8 and the definition of Designated Entity ambiguous, which, in turn, severely hinders PJM's ability to implement section 1.5.8's requirements.[104]  Therefore, PJM argues that the Commission should find PJM's

---

[101] ITOs Comments on Complaint, Docket No. EL22-80-000, at 17-18 (citing PJM, Intra-PJM Tariffs, OA, Schedule 6 Sec 1.6 (4.0.0), § 1.6(b) (Approval of the Final Regional Transmission Expansion Plan); PJM, Intra-PJM Tariffs, OA, Schedule 6 Sec 1.7 (3.0.0), § 1.7(c) (Obligation to Build)); ITOs Comments on PJM 206 Filing, Docket No. EL22-85-000, at 15 (same).

[102] *See* ITOs Comments on Complaint, Docket No. EL22-80-000, at 4-5; *see also id.* at 6-7 (citing PJM, Intra-PJM Tariffs, OA, Schedule 6 Sec 1.5 (28.0.0), § 1.5.8(m)(1) (Immediate-need Reliability Projects), *id.* § 1.5.8(n) (Reliability Violations on Transmission Facilities Below 200 kV), and *id.* § 1.5.8 (p) Thermal Reliability Violations on Transmission Substation Equipment)); *id.* at 18-19; ITOs Comments on PJM 206 Filing at 5-8 (arguing that PJM's filings in compliance with Order No. 1000 and the Commission orders accepting them do not suggest that Designated Entity Agreement requirements should or would apply to projects outside of a competitive proposal process for purposes of regional cost allocation); *id.* at 16.

[103] ITOs Comments on Complaint, Docket No. EL22-80-000, at 7-8; *see also* ITOs Comments on PJM 206 Filing at 4; PJM 206 Filing at 8.

[104] PJM 206 Filing at 1-2.

Operating Agreement to be unjust and unreasonable and revise section 1.5.8 and the
Designated Entity definition accordingly.[105]

47.     PJM states that the issue in Docket No. EL22-85-000 is for which *projects*
included in the RTEP is the execution of a *pro forma* Designated Entity Agreement
required, and not which *entity* must execute a Designated Entity Agreement.[106]  PJM also
contends that the interpretation of section 1.5.8 that Complainants argue for in Docket
No. EL22-80-000, i.e., that any project planned in accordance with section 1.5.8 must
execute a Designated Entity Agreement, would lead to an unjust and unreasonable
application of the Operating Agreement.[107]  Rather, PJM argues that the requirement to
execute a Designated Entity Agreement applies only to those projects that are chosen
through PJM's competitive proposal window process *and* selected in the RTEP for
purposes of cost allocation.[108]

48.     PJM states that the crux of the issue is that while Schedule 6, section 1.5.8 details
the competitive proposal window process for RTEP projects in subsections (a) through
(k) and (m)(2), not every RTEP project planned in accordance with section 1.5.8 goes
through the competitive proposal window process, and not every project that goes
through a competitive proposal window process is selected in the RTEP for purposes of
cost allocation.[109]  For example, PJM states that under sections 1.5.8(m)(1), 1.5.8(n), and
1.5.8(p), three particular types of transmission projects are exempt from competitive
proposal window processes.[110]  PJM also states that many RTEP projects planned in
accordance with section 1.5.8 are local transmission projects that are designated to the
incumbent transmission owner and whose costs are 100% allocated to the local

---

[105] *Id.* at 1-2.

[106] *Id.* at 2.

[107] *Id.* at 2-3.

[108] *Id.* at 6.

[109] *Id.* at 3, 10-11.

[110] *Id.* at 10 n.30 (identifying Immediate-need Reliability Projects for which PJM
determines that a competitive proposal window may not be feasible under Schedule 6,
§ 1.5.8(m)(1), transmission solutions addressing certain reliability violations on
transmission facilities below 200 kV under section 1.5.8(n), and transmission solutions
addressing thermal reliability violations on substation equipment under section 1.5.8(p)).

transmission zone.[111]  PJM states that while some categories of Transmission Owner Designated Projects are included in the RTEP, not all such projects are selected in the regional transmission plan for purposes of cost allocation.[112]

49.      PJM argues that, despite the clear intent of its Order No. 1000 compliance filings, the relevant Operating Agreement language is ambiguous as to when PJM should use Designated Entity Agreements for RTEP projects.[113]  PJM contends that the confusion stems from imprecise and casual usage of the defined term "Designated Entity" throughout the Operating Agreement, as that term is used even for RTEP projects that are exempt from Order No. 1000 competitive proposal window processes.[114]  PJM argues that while multiple sections in Schedule 6, section 1.5.8 use the defined term "Designated Entity," that term is "improperly being used as shorthand for the broader concept of the entity responsible for constructing RTEP projects" in sections 1.5.8(g), (h), (*l*), and (m)(1).  According to PJM, these sections address projects that are either:  (1) sponsored through a competitive proposal window but then have their costs allocated solely to a single zone; or, (2) not sponsored through a competitive proposal window process but instead selected by PJM and designated to the incumbent transmission owner.[115]  Use of the defined term Designated Entity in these sections, PJM argues, is improper because the projects being addressed were not both chosen through PJM's competitive window process *and* selected in the RTEP for purposes of cost allocation.[116]

50.      Citing Order No. 1000 and its Order No. 1000 compliance filings, PJM argues that its intent in proposing Schedule 6, section 1.5.8, the definition of "Designated Entity," and the *pro forma* Designated Entity Agreement was to comply with Order No. 1000, and not to amend the Operating Agreement in any way beyond what Order No. 1000 requires.[117]  PJM contends that Order No. 1000 was clear that the reforms directing the implementation of competitive transmission development processes apply only to

---

[111] PJM 206 Filing at 3 (citing PJM, Intra-PJM Tariffs, OA, Schedule 6 Sec 1.5. (28.0.0), § 1.5.8(*l*) (Transmission Owners Required to be the Designated Entity)).

[112] PJM 206 Filing at 11 (quoting 2018 DEA Order, 164 FERC ¶ 61,021 at PP 32, 33 & n.61).

[113] PJM 206 Filing at 14; *see also id.* at 11-14 (citations omitted).

[114] *Id.* at 14.

[115] *See id.* at 18.

[116] *Id.*

[117] *See id.* at 9-10 (citations omitted); *see also id.* at 7-9 (citations omitted).

transmission facilities that are selected in a regional transmission plan for purposes of cost allocation and not, for example, to transmission facilities in local transmission plans.[118]  PJM contends that Order No. 1000 distinguished between a "transmission facility in a regional transmission plan" and a "transmission facility selected in a regional transmission plan for purposes of cost allocation," and the Commission found this distinction essential.[119]  PJM argues that, in its view, Order No. 1000's reforms do not apply to a transmission facility in the regional transmission plan that has not been selected using the competitive proposal window process.[120]

51.    Accordingly, PJM argues that the intent of its Order No. 1000 compliance filings was for the defined term "Designated Entity" to identify those entities (whether incumbent transmission owners or nonincumbent transmission developers) that both: (1) meet applicable pre-qualification requirements; and (2) compete in the competitive proposal window to be the entity designated to construct, own and/or finance transmission projects chosen through a competitive proposal window as the more efficient or cost-effective solution to be selected in the RTEP for purposes of cost allocation.[121]  Similarly, PJM argues that the Designated Entity Agreement was added to its governing documents as part of the Order No. 1000 compliance process, and references to the *pro forma* Designated Entity Agreement in Schedule 6, section 1.5.8(j)

---

[118] *See id.* at 8 (quoting Order No. 1000, 136 FERC ¶ 61,051 at P 7).

[119] *Id.* (quoting Order No. 1000, 136 FERC ¶ 61,051 at P 5 (emphasis removed)).

[120] *Id.* at 9 (quoting Order No. 1000, 136 FERC ¶ 61,051 at P 63); *see also* Order No. 1000, 136 FERC ¶ 61,051 at P 63 (explaining that "[t]ransmission facilities selected in a regional transmission plan for purposes of cost allocation are transmission facilities that have been selected pursuant to a transmission planning region's Commission-approved regional transmission planning process for inclusion in a regional transmission plan for purposes of cost allocation because they are more efficient or cost-effective solutions to regional transmission needs" and "may include both regional transmission facilities . . . and interregional transmission facilities" but does not include a transmission facility "that has not been selected in the manner described above, such as a local transmission facility or a merchant transmission facility").

[121] PJM 206 Filing at 11 (citing PJM, Compliance Filing of PJM Interconnection, L.L.C., Docket No. ER13-198-000, at 49-50 (filed Oct. 25, 2012) (PJM First Order No. 1000 Compliance Filing)).

came in PJM's second Order No. 1000 compliance filing, which was intended to "ensure smooth implementation of the new competitive solicitation process."[122]

52.     Based on these compliance filing statements, PJM concludes that the requirement to execute a Designated Entity Agreement "unambiguously applies only to projects selected in PJM's Order No. 1000 competitive window process" and "not broadly to any project planned in accordance with section 1.5.8."[123]  PJM also contends that the Commission recognized this limited application when it stated that the Designated Entity Agreement followed designations "by PJM to construct an RTEP project pursuant to PJM's competitive process set forth in Schedule 6."[124]  PJM further argues that the *pro forma* Designated Entity Agreement's first "whereas" clause, which indicates that PJM and the counterparty are entering into the Designated Entity Agreement "in accordance with Order No. 1000," and the Commission's acceptance of this language and rejection of other language over protest, indicates that the Designated Entity Agreement was adopted to fulfill the requirements of Order No. 1000 and nothing more.[125]  Given this context, PJM contends that it could not have intended shorthand references to Designated Entity in sections 1.5.8(g), (h), (*l*), and (m)(1) to have the same meaning (and lead to the same Designated Entity Agreement-related requirements) as it does when the term is used in relation to projects that PJM considers to be within Order No. 1000's

---

[122] PJM 206 Filing at 12 (quoting PJM, Compliance Filing of PJM Interconnection, L.L.C., Docket No. ER13-198-002, at 44 (filed July 22, 2013) (PJM Second Order No. 1000 Compliance Filing)) (emphasis deleted).

[123] PJM 206 Filing at 13; *see also id.* (quoting PJM, Compliance Filing of PJM Interconnection, L.L.C., Docket No. ER13-198-004, at 11 (filed July 14, 2014) (PJM Third Order No. 1000 Compliance Filing)); *id.* at 24.

[124] PJM 206 Filing at 13 (quoting PJM Designated Entity Agreement Order, 148 FERC ¶ 61,187 at P 46) (emphasis deleted).

[125] *Id.* at 13-14, 24 (citations omitted).  PJM also contends that to read Operating Agreement language that PJM filed to comply with Order No. 1000 any more broadly than that necessary to merely comply with Order No. 1000 would prevent a countervailing filed rate doctrine problem, as Operating Agreement section 18.6 limits PJM's ability to propose changes to the Operating Agreement to situations "provided by law" or "upon . . .  approval . . .  by the Members Committee," and the notice PJM provided at the time of its Order No. 1000 compliance filings indicated that those filings were limited to only complying with Order No. 1000.  *See* PJM 206 Filing at 25-26 (quoting PJM, Intra-PJM Tariffs, OA, 18.6 Amendment (1.0.0), § 18.6; *see also* PJM, Intra-PJM Tariffs, OA, 18.6 Amendment (1.0.0), § 18.6.  PJM also contends that if PJM's filed proposal went beyond the compliance directive of Order No. 1000, the Commission would have rejected it.  PJM 206 Filing at 26-27.

scope (i.e., projects chosen through PJM's competitive proposal windows and selected in the RTEP for purposes of cost allocation).[126]

53.    PJM argues that, when interpreting Schedule 6, section 1.5.8,[127] it is necessary to examine both the regulatory context in which section 1.5.8 was adopted and relevant extrinsic evidence because the relevant language is susceptible to multiple interpretations and uses the defined term "Designated Entity" even for projects that are exempt from PJM's Order No. 1000-compliant competitive proposal window processes.[128]  PJM states that under the currently-effective section 1.5.8, PJM cannot implement section 1.5.8's requirements without being subject to challenge either by stakeholders who believe that a Designated Entity Agreement is required for every project planned pursuant to section 1.5.8, or by incumbent transmission owners who believe that PJM should not issue Designated Entity Agreements for RTEP projects chosen through the competitive proposal window process whose costs are allocated to a single zone.[129]

54.    PJM also argues that its course of performance in implementing Schedule 6, section 1.5.8's Designated Entity Agreement-related requirements further supports PJM's position.[130]  PJM states that from 2014, at the outset of its competitive proposal window processes, through February 2022, it required Designated Entity Agreements only for those projects that were both:  (1) chosen through a competitive proposal window; *and* (2) selected in the RTEP for purposes of cost allocation.[131]  PJM states that during that time, it did not require Designated Entity Agreements for projects that it did not consider

---

[126] PJM 206 Filing at 19-20 (quoting in part PJM Third Order No. 1000 Compliance Filing at 11, Docket No. ER13-198-004, and PJM Designated Entity Agreement Order, 148 FERC ¶ 61,187 at P 46).

[127] *See, e.g.*, PJM, Intra-PJM Tariffs, OA, Schedule 6 Sec 1.5 (28.0.0), § 1.5.8(g) (Procedures if No Long-lead Project or Economic-based Enhancement or Expansion Proposal is Determined to be the More Efficient or Cost-Effective Solution), *id.* § 1.5.8(h) (Procedures if No Short-term Project Proposal is Determined to be the More Efficient or Cost-Effective Solution), *id.* § 1.5.8(*l*) (Transmission Owners Required to be the Designated Entity), and *id.* § 1.5.8(m)(1) (Immediate-need Reliability Projects).

[128] PJM 206 Filing at 14-15 (citing in part *Devon Power LLC v. ISO New England, Inc.*, 114 FERC ¶ 61,259, at P 24 (2006) and *Colo. Interstate Gas Co.*, 32 FERC ¶ 63,033, at 65,108 (1985)).

[129] PJM 206 Filing at 17-18; *see also id.* at 15-16 & nn.50, 52.

[130] *Id.* at 28-31.

[131] *Id.* at 28.

to be subject to Order No. 1000's requirements, such as PJM-chosen unsponsored projects under sections 1.5.8(g) or (h), Immediate-need Reliability Projects under section 1.5.8(m)(1), projects exempt from competitive proposal windows pursuant to sections 1.5.8(n) or (p), or projects chosen for inclusion in the RTEP through a competitive proposal window but whose costs are not regionally allocated.[132]

55.     To address the provisions of the Operating Agreement that it argues are unjust and unreasonable, PJM proposes two sets of revisions.  First, PJM proposes language that would limit the Designated Entity definition so that it applies only to projects "sponsored by" an incumbent transmission owner or nonincumbent transmission developer through a competitive proposal window as set forth in Schedule 6, section 1.5.8(c).[133]  Second, PJM proposes to replace the term "Designated Entity" in sections 1.5.8(g), (h), (*l*) and (m)(1), with other language to clarify that incumbent transmission owners would be designated to construct, own and/or finance projects in accordance with those sections.[134]  PJM contends that these revisions are just and reasonable because they would align the Operating Agreement's language with the scope of Order No. 1000's reforms, resolve ambiguities, and eliminate the possibility of conflicting interpretations.[135]  PJM requests that the Commission set a refund effective date of August 26, 2022, the date on which PJM submitted its filing.[136]

56.     Finally, PJM states that the PJM 206 filing is PJM's last option to clarify Schedule 6, section 1.5.8's ambiguities, which are hindering PJM's effective implementation of that provision.[137]  PJM states that it has tried multiple times, through

---

[132] *Id.* at 29-30.  PJM further states that Schedule 6, sections 1.5.8(n) and (p) do not use the term "Designated Entity" in describing that such projects will be designated to the incumbent transmission owners.  *Id.* at 30.  PJM states as well that these sections, and section 1.5.8(m)(1), differ from section 1.5.8(m)(2) on Immediate-need Reliability Projects in that section 1.5.8(m)(2) specifically cross-references the notification and acceptance of Designated Entity status provisions of section 1.5.8(i) and 1.5.8(j), while sections 1.5.8(n), 1.5.8(p), and 1.5.8(m)(1) do not.  *See id.* at 19, 30.

[133] *Id.* at 31-34.

[134] *Id.* at 31-32, 34-37.  PJM also proposes what it describes as clarifying language to Schedule 6, section 1.5.8(i) stating that the notification requirements apply only to projects included in the RTEP "for regional cost allocation purposes."  *Id.* at 37.

[135] *Id.* at 37-38.

[136] *Id.* at 38.

[137] *Id.* at 6.

multiple avenues, to address the ambiguous, imprecise, and overly broad usage of the
term "Designated Entity," including through PJM's filing in Docket No. ER13-198-008,
which was not accepted by the Commission on procedural grounds, and through other
subsequent stakeholder processes.[138]

### iv.    Responsive Pleadings to PJM 206 Filing

57.    Joint Protestors assert that PJM's 206 Filing fails to meet its burden to show that
the currently-effective Schedule 6, section 1.5.8 is unjust, unreasonable, or unduly
discriminatory.[139]  Joint Protestors contend that although there may be differing
interpretations of section 1.5.8, that fact alone does not support PJM's claim that
section 1.5.8's Designated Entity Agreement-related requirements are ambiguous.[140]
Ambiguity, Joint Protestors argue, must be demonstrated within the four corners of the
relevant document prior to considering extrinsic evidence, and absent ambiguity within
the four corners of the document, resorting to extrinsic evidence is erroneous.[141]  Joint
Protestors assert that the plain language of section 1.5.8 is clear and that there is no
ambiguity to support PJM's arguments.  According to Joint Protestors, section 1.5.8
provides that PJM "shall . . . tender to the Designated Entity an executable Designated
Entity Agreement."[142]  It was PJM's responsibility, Joint Protestors argue, to ensure that
the Operating Agreement language that PJM filed manifested PJM's intent, as PJM is

---

[138] *Id.* at 6-7; *see also* 2018 DEA Order, 164 FERC ¶ 61,021; 2019 DEA
Rehearing Order, 168 FERC ¶ 61,121; 2022 Rejection Order, 178 FERC ¶ 61,083.

[139] Joint Protest, Docket Nos. EL22-80-00 and EL22-85-000, at 1-2.  Joint
Protestors also move for leave to answer the filings made by PJM and the ITOs in Docket
No. EL22-80-000.  *Id.* at 2, 4-5.

[140] *See id.* at 6.

[141] *Id.* at 6 (citing *Papago Tribal Util. Auth. v. FERC*, 723 F.2d 950, 955 (D.C. Cir.
1983) and *Carey Can., Inc. v. Columbia Cas. Co.*, 940 F.2d 1548, 1556 (D.C. Cir.
1991)); *see also id.* at 14-15 (arguing that a "non-compliant . . . practice" is not evidence
of ambiguity).  Joint Protestors also contend that PJM's decision in February 2022 to
begin issuing Designated Entity Agreements for projects subject to competitive proposal
windows but whose costs are not regionally allocated undercuts PJM's arguments
regarding its implementation practices.  *See* Joint Protest, Docket Nos. EL22-80-00 and
EL22-85-000, at 6.

[142] *See* Joint Protest, Docket Nos. EL22-80-00 and EL22-85-000, at 13 (quoting
PJM, Intra-PJM Tariffs, OA, Schedule 6 Sec 1.5 (28.0.0), § 1.5.8(j) (Acceptance of
Designation)); *see also id.* at 17.

now bound to apply those terms.[143]  Joint Protestors dispute PJM's assertions that the defined term "Designated Entity" is "'shorthand for a broader concept'" or that its use is "'imprecise and improper,'" and further argue that the existence of detailed procedural language in section 1.5.8(m)(2) does not prove anything about the absence of such language in section 1.5.8(m)(1).[144]  Regarding section 1.5.8(g) and section 1.5.8(h), Joint Protestors assert that there is "nothing inaccurate about . . . purposefully us[ing] the term 'Designated Entity'" in the language of those provisions.[145]

58.     Joint Protestors also argue that because the Commission has found that the currently-effective Schedule 6, section 1.5.8 is just, reasonable, and not unduly discriminatory, PJM is required to comply with its terms, and PJM's arguments about the scope of Order No. 1000's reforms amount to a collateral attack on prior orders.[146]  Joint Protestors further argue that in the Order No. 1000 compliance process, parties were on notice that PJM's proposals may be "superior to" Order No. 1000's minimum requirements.  Thus, contrary to PJM's arguments,[147] Joint Protestors argue that neither the Commission's acceptance of the terms in PJM's proposals nor the Commission's enforcement of their plain language presents filed rate doctrine concerns.  According to Joint Protestors, any concerns that PJM has about its filing rights as to those proceedings are therefore waived.[148]  In addition, Joint Protestors assert that PJM's conception of Order No. 1000 transmission planning is too narrow, and that Order No. 1000 governs both projects that are selected through a competitive proposal window and those that are not.[149]  Joint Protestors further argue that section 1.5.8 explicitly contemplates the possibility that identified solutions to regional transmission needs may be eligible for regional cost allocation despite not having been subject to a competitive proposal window.[150]

---

[143] *See* Joint Protest, Docket Nos. EL22-80-00 and EL22-85-000, at 14.

[144] *See id.* at 7.

[145] *See id.* at 20.

[146] *See id.* at 5, 10-11, 12, 14-15.

[147] *See supra* note 126.

[148] *See* Joint Protest, Docket Nos. EL22-80-00 and EL22-85-000, at 12.

[149] *Id.* at 15-17.

[150] *Id.* at 15-16.

59.     Data Center Coalition argues that under Schedule 6, entities designated to construct, own, and operate any Immediate-need Reliability Projects are unambiguously included within the Designated Entity definition.[151] Data Center Coalition also contends that, but for the immediate need designation, Immediate-need Reliability Projects addressed in Schedule 6, section 1.5.8(m)(1) would be subject to a competitive proposal window (and therefore a Designated Entity Agreement, by extension), a fact that supports applying Designated Entity Agreement requirements to such projects.[152] Data Center Coalition argues that PJM has not provided any reason to look beyond the Operating Agreement's express language in determining the proper scope of Designated Entity Agreement requirements and that, even if the Commission finds that language to be ambiguous, the importance of project construction milestones is a good reason to impose Designated Entity Agreement-related requirements on Immediate-need Reliability Projects.[153]

60.     ITOs agree with PJM that the currently-effective Schedule 6, section 1.5.8 is imprecise, and therefore unjust and unreasonable.  In turn, ITOs request that the Commission grant PJM's 206 Filing as submitted, without hearing, modification, or condition.[154]

61.     In its Second Answer, PJM contends that, contrary to Joint Protestors' assertions, it has demonstrated that references to the terms "Designated Entity" and "Designated Entity Agreement" in Schedule 6, section 1.5.8 were imprecisely drafted and that, following precedent, the Commission should resolve ambiguities by looking to past

---

[151] Data Center Coalition Comments on PJM 206 Filing, Docket No. EL22-85-000, at 1 (citing PJM, Intra-PJM Tariffs, OA, Schedule 6 Sec 1.5. (28.0.0), § 1.5.8(m)(1) (Immediate-need Reliability Projects)); *see also id.* at 4 (quoting definition of Designated Entity).

[152] *See* Data Center Coalition Comments on PJM 206 Filing, Docket No. EL22-85-000, at 3-6.  For similar reasons related to competition between incumbent transmission owners and nonincumbent transmission developers, Data Center Coalition also disputes that imposing security requirements on all developers of Immediate-need Reliability Projects would lead to unjust or unreasonable results.  *See id.* at 6-7 (citing PJM 206 Filing at 21-23).

[153] Data Center Coalition Comments on PJM 206 Filing, Docket No. EL22-85-000, at 2, 4-5.

[154] ITOs Comments on PJM 206 Filing, Docket No. EL22-85-000, at 2, 12-14, 18-19).

Order No. 1000 compliance proceedings.[155]  Regarding its past invocations of the consistent with or superior to standard recognized by the Commission in Order No. 1000, PJM argues that it did not seek any deviation from Order No. 1000's requirements, nor did it intend to amend the Operating Agreement in any manner beyond what was required to satisfy Order No. 1000.

## b. **Commission Determination**

62.    As discussed further below, we find that the Operating Agreement is not ambiguous as to when and for what RTEP projects Designated Entity Agreements are required and therefore is not unjust and unreasonable.  We further find that PJM has violated the Operating Agreement because PJM has not executed Designated Entity Agreements in all situations required by the Operating Agreement.  Accordingly, as discussed below, we grant the Complaint, in part, and deny the Complaint, in part.  We also grant the PJM 206 Filing, in part, and deny the PJM 206 Filing, in part.

### i.    **Immediate-need Reliability Projects, Short-term Projects, and Long-lead Projects**

63.    We agree with the Complainant's interpretation that the Operating Agreement requires an incumbent transmission owner to sign a Designated Entity Agreement for all projects for which an incumbent transmission owner is the Designated Entity.  The Operating Agreement explains when Designated Entity Agreements are required for RTEP projects subject to Schedule 6, section 1.5.8.  First, the Operating Agreement defines "Designated Entity" as follows:

> "Designated Entity" shall mean an entity, *including an existing Transmission Owner* or Nonincumbent Developer, designated by the Office of the Interconnection with the responsibility to construct, own, operate, maintain, and finance Immediate-need Reliability Projects, Short-term Projects, Long-lead Projects, or Economic-based Enhancements or Expansions pursuant to Operating Agreement, Schedule 6, section 1.5.8.[156]

---

[155] PJM Second Answer, Docket Nos. EL22-80-000 and EL22-85-000, at 3-5, 8-10) (citing *PJM Interconnection, L.L.C.*, 156 FERC ¶ 61,030, at P 24 (2016), *order denying reh'g and accepting compliance filing*, 157 FERC ¶ 61,193, *vacated on other grounds by Old Dominion Elec. Coop. v. FERC*, 898 F.3d 1254 (D.C. Cir. 2018)).

[156] PJM, Intra-PJM Tariffs, OA, Definitions (C - D), OA Definitions C – D (32.0.0) (emphasis added).

This definition includes both incumbent transmission owners and nonincumbent transmission developers who are designated by PJM with the responsibility to construct, own, operate, maintain, and finance projects pursuant to section 1.5.8.[157]

64.     Second, Schedule 6, section 1.5.8 instructs PJM to identify "Designated Entities" for the following types of RTEP projects:

> (f)     **Entity-Specific Criteria Considered in Determining the Designated Entity for a Project**.  In determining whether the entity proposing a Short-term Project, Long-lead Project or Economic-based Enhancement or Expansion recommended for inclusion in the plan shall be *the Designated Entity*, [PJM] shall consider. . .

> (g)     **Procedures if No Long-lead Project or Economic-based Enhancement or Expansion Proposal is Determined to be the More Efficient or Cost-Effective Solution**. . . . The Transmission Owner(s) in the Zone(s) where the project is to be located shall be *the Designated Entity(ies)* for such project. . . .

> (h)     **Procedures if No Short-term Project Proposal is Determined to be the More Efficient or Cost-Effective Solution.** . . . The Transmission Owner(s) in the Zone(s) where the Short-term Project is to be located shall be *the Designated Entity(ies)* for the Project. . . .

> (l)     **Transmission Owners Required to be the Designated Entity.** . . . the Transmission Owner(s) in whose Zone(s) a project proposed pursuant to the Operating Agreement, Schedule 6, section 1.5.8(c) is to be located will be *the Designated Entity* for the project, when the Short-term Project or Long-lead Project is [one of five types] . . .

> (m)     **Immediate-need Reliability Projects:**

> (m)(1) . . . The descriptions shall include an explanation of the decision to designate the Transmission Owner as *the Designated Entity* for the Immediate-need Reliability Project rather than conducting a proposal window . . .

---

[157] *Id*.

> (m)(2) . . . After PJM Board approval, [PJM], in accordance
> with . . . section 1.5.8(i), shall notify the entities that have
> been designated as *Designated Entities* for Immediate-need
> Projects included in the Regional Transmission Expansion
> Plan of such designations.  Designated Entities shall accept
> such designations in accordance with the Operating
> Agreement, Schedule 6, section 1.5.8(j).[158]

We find that these provisions require PJM to choose a "Designated Entity" for *every*
Long-lead Project, Short-term Project, or Immediate-need Reliability Project.  Moreover,
we find that nothing in the text of these provisions limits their applicability to only a
subset of projects within each type.

65.    Finally, the Operating Agreement requires PJM to notify Designated Entities of
their designation and requires Designated Entities to maintain their Designated Entity
status, to execute a Designated Entity Agreement, and to submit a letter of credit.

> (i)    **Notification of Designated Entity.**  Within
> 15 Business Days of PJM Board approval of the Regional
> Transmission Expansion Plan, the Office of the
> Interconnection shall notify the entities that have been
> designated as the *Designated Entities* for projects included in
> the Regional Transmission Expansion Plan of such
> designations.
>
> . . .
>
> (j)    **Acceptance of Designation.**  Within 30 days of
> receiving notification of its designation as a *Designated
> Entity*, the existing Transmission Owner or Nonincumbent
> Developer shall notify the Office of the Interconnection of its
> acceptance of such designation.
>
> . . .
>
> To retain its status as a *Designated Entity*, within 60 days of
> receiving an executable Designated Entity Agreement (or
> other such period as mutually agreed upon by the Office of
> the Interconnection and the Designated Entity), the
> *Designated Entity* (*both existing Transmission Owners and*

---

[158] PJM, Intra-PJM Tariffs, OA, Schedule 6 Sec 1.5 (28.0.0), §§ 1.5.8(f), (g), (h),
(l), (m) (emphasis added).

> *Nonincumbent Developers*) shall submit to the Office of the
> Interconnection a letter of credit as determined by the Office
> of Interconnection to cover the incremental costs of
> construction resulting from reassignment of the project, and
> return to the Office of the Interconnection an executed
> Designated Entity Agreement containing a mutually agreed
> upon development schedule.[159]

Contrary to PJM's claims, we find that the Operating Agreement does not support PJM's argument that the requirement to sign a Designated Entity Agreement and submit a letter of credit is dependent on whether PJM chooses a transmission project through a competitive proposal window, or whether the transmission project is selected in the regional transmission plan for purposes of cost allocation.[160]  In short, where Schedule 6, section 1.5.8 uses the term "Designated Entity," the relevant "Designated Entity(ies)" must sign a Designated Entity Agreement and provide security under section 1.5.8(j).[161]

66.    Importantly, we find that Schedule 6, section 1.5.8 of the Operating Agreement is clear in its use of the term "Designated Entity."  In each instance referenced above, the term "Designated Entity" refers to the entity designated by PJM with the responsibility to construct, own, operate, maintain, and finance a transmission project, whether that transmission project is a PJM-chosen sponsored project or PJM-chosen unsponsored project (i.e., a Short-term Project, Long-lead Project, Economic-based Enhancement or Expansion, or Immediate-need Reliability Project).[162]  While PJM is correct that not all projects planned in accordance with section 1.5.8 go through a competitive proposal window process, and that not all projects that go through a competitive proposal window

---

[159] PJM, Intra-PJM Tariffs, OA, OA Schedule 6 Sec 1.5 (28.0.0), § 1.5.8(i) (Notification of Designated Entity) (emphasis added); *id*. § 1.5.8(j) (Acceptance of Designation) (emphasis added).

[160] *See* PJM, Intra-PJM Tariffs, OA, Schedule 6 Sec 1.5 (28.0.0), § 1.5.8(c) (Project Proposal Windows); *id.* § 1.5.8(f) (Entity-Specific Criteria Considered in Determining the Designated Entity for a Project).

[161] PJM, Intra-PJM Tariffs, OA, Schedule 6 Sec 1.5 (28.0.0), § 1.5.8(j) (Acceptance of Designation).

[162] PJM, Intra-PJM Tariffs, OA, Schedule 6 Sec 1.5 (28.0.0), § 1.5.8(c) (Project Proposal Windows); *id.* § 1.5.8(f) (Entity-Specific Criteria Considered in Determining the Designated Entity for a Project); *id.* § 1.5.8(m)(2) (Immediate-need Reliability Projects).

process are selected in the regional transmission plan for purposes of cost allocation,[163] those facts do not determine whether the Operating Agreement requires PJM and the relevant Designated Entity to execute a Designated Entity Agreement—instead, it is designation as a Designated Entity that matters.[164]  That is, the term "Designated Entity" is used with respect to both projects that PJM chooses through a competitive proposal window under section 1.5.8(c), whether or not those projects are selected in the regional transmission plan for purposes of cost allocation, and projects that PJM chooses outside of a competitive proposal window, designating the project directly to the incumbent transmission owner.[165]  We thus disagree with PJM's assertion that the term "Designated Entity" in sections 1.5.8(g), (h), (*l*) and (m)(1) of the Operating Agreement is "improperly being used as shorthand for the broader concept of the entity responsible for constructing RTEP projects."[166]

67.     Further, as discussed, for each type of project noted above, where the governing Operating Agreement provision explicitly uses the term "Designated Entity," Schedule 6 also prescribes a detailed process that requires PJM to notify the Designated Entity of its designation and then requires PJM and the Designated Entity to execute a Designated Entity Agreement involving the provision of security.[167]

68.     We disagree with PJM and the ITOs that the reference in Schedule 6, section 1.5.8(m)(2) to section 1.5.8(j) should be read to exempt the developers of certain types of RTEP projects from the process outlined in section 1.5.8(j).[168]  Instead, we find

---

[163] *See* PJM Second Answer, Docket No. EL22-80-000 and EL22-85-000, at 2-3; PJM 206 Filing at 3, 10-11, 18.

[164] *See supra* PP 62-65; *see also* Joint Protest, Docket Nos. EL22-80-00 and EL22-85-000, at 15-17.

[165] PJM, Intra-PJM Tariffs, OA, Schedule 6 Sec 1.5 (28.0.0), § 1.5.8(g) (Procedures if No Long-lead Project or Economic-based Enhancement or Expansion Proposal is Determined to be the More Efficient or Cost-Effective Solution); *id.* § 1.5.8(h) (Procedures if No Short-term Project Proposal is Determined to be the More Efficient or Cost-Effective Solution).

[166] *See* PJM Answer to Complaint, Docket No. EL22-80-000, at 7-10; PJM 206 Filing at 18.

[167] PJM, Intra-PJM Tariffs, OA, Schedule 6 Sec 1.5 (28.0.0), § 1.5.8(i)-(j).

[168] *See* ITOs Comments on Complaint, Docket No. EL22-80-000, at 16-17; ITOs Comments on PJM 206 Filing at 13-14; PJM 206 Filing at 19.  The relevant language states, "[i]f, in the judgment of the Office of the Interconnection, there is sufficient time for the Office of the Interconnection to accept proposals in a shortened proposal window

that the reference to section 1.5.8(j) in section 1.5.8(m)(2) is to make clear which provisions of section 1.5.8 apply to "a shortened proposal window for Immediate-need Reliability Projects," if one is held.[169]  This clarification is necessary because shortened proposal windows differ from the competitive proposal window process outlined under section 1.5.8(c).  Thus, we agree with Joint Protestors and find that PJM is incorrect in its assertion that this reference in section 1.5.8(m)(2) implies that projects subject to section 1.5.8(m)(1) (i.e., Immediate-need Reliability Projects where it is not feasible to open a full or shortened competitive proposal window) are not subject to the requirement to execute a Designated Entity Agreement and post the required security.[170]

69.      We also do not find merit in PJM's argument that Complainants' interpretation of the Operating Agreement violates the filed rate doctrine.  PJM argues that section 18.6 of the Operating Agreement imposes limits on PJM such that, on compliance with Order No. 1000, PJM could amend the Operating Agreement, but only as far as Order No. 1000 specifically required.[171]  That is, PJM contends that it "cannot have added provisions to the Operating Agreement beyond what was necessary to comply with Order No. 1000."[172]  PJM's argument reflects a misunderstanding of both section 18.6 of the Operating Agreement and the nature of PJM's Order No. 1000 compliance proposals.  First, as PJM acknowledges, section 18.6 of the Operating Agreement permits changes that are "provided by law,"[173] which includes changes added "by order of the

_____

for Immediate-need Reliability Projects, the Office of the Interconnection shall post on the PJM website the violations and system conditions that could be addressed by Immediate-need Reliability Project proposals . . . After PJM Board approval, the Office of the Interconnection . . . shall notify the entities that have been designated as Designated Entities for Immediate-need Projects included in the Regional Transmission Expansion Plan of such designations.  *Designated Entities shall accept such designations in accordance with the Operating Agreement, Schedule 6, section 1.5.8(j)*."  PJM, Intra-PJM Tariffs, OA, Schedule 6 Sec 1.5 (28.0.0), § 1.5.8(m)(2) (Immediate-need Reliability Projects) (emphasis added).

[169] *See* PJM, Intra-PJM Tariffs, OA, Schedule 6 Sec 1.5 (28.0.0), § 1.5.8(m)(2).

[170] *See* Joint Protest, Docket Nos. EL22-80-00 and EL22-85-000, at 7.

[171] PJM Answer to Complaint, Docket No. EL22-80-000, at 17-21; PJM 206 Filing at 25-27.

[172] PJM Answer to Complaint, Docket No. EL22-80-000, at 20; *see also* PJM 206 Filing at 25.

[173] *See* PJM 206 Filing at 25-26 & n.75 (contending that under PJM, Intra-PJM Tariffs, OA, 18.6 Amendment (1.0.0), § 18.6, PJM's authority to amend the Operating Agreement is "limited to only that directed by law or by the Members Committee"); *see*

Commission"[174] pursuant to FPA section 206. Second, we note that PJM sought approval of its Order No. 1000-compliant Schedule 6 processes under the "'consistent with or superior to' standard,"[175] as permitted by the Commission.[176] Because PJM sought the relevant changes to its Operating Agreement in order to comply with Order No. 1000 and on compliance pursuant to FPA section 206, we find that the process for making such changes was "provided by law," as recognized by (and consistent with) section 18.6 of the Operating Agreement,[177] such that there is no filed rate doctrine concern here that limits PJM's need to comply with the Commission-approved terms of its Operating Agreement. Rather, PJM filed an Order No. 1000-compliant regional transmission planning process, which the Commission accepted. To the extent that PJM now believes that portions of its compliance proposals were "superior to" Order No. 1000's minimum requirements, that does not implicate their current effectiveness. PJM proposed to require that "both incumbent transmission owners and nonincumbent transmission developers . . . be subject to the Designated Entity Agreement," and the Commission accepted that approach as consistent with or superior to Order No. 1000's requirements.[178] As the Commission has explained, PJM's Order No. 1000 compliance

---

*also* PJM, Intra-PJM Tariffs, OA, 18.6 Amendment (1.0.0), § 18.6 (providing, in part, that the Operating Agreement may be amended "as provided by law").

[174] PJM Answer to Complaint, Docket No. EL22-80-000, at 17-18; PJM 206 Filing at 25.

[175] *See* PJM Answer to Complaint, Docket No. EL22-80-000, at 18 (quoting PJM First Order No. 1000 Compliance Filing at 2-3); PJM 206 Filing at 10, 24 & n.70 (same).

[176] *See* PJM First Compliance Order, 142 FERC ¶ 61,214 at PP 112, 114 (citing, in part, Order No. 1000, 136 FERC ¶ 61,051 at PP 149, 216 & n.193); *see also* 18 C.F.R. § 35.28(c)(4) (2023); 2019 DEA Rehearing Order, 168 FERC ¶ 61,121 at P 8 (citing (2018 DEA Order, 164 FERC ¶ 61,021 at P 28) (explaining that "as part of the Order No. 1000 compliance proceedings, the Commission requires public utility transmission providers that proposed to use *pro forma* development agreements, such as PJM's Designated Entity Agreement, to file such agreements for the Commission's review.").

[177] *See* PJM, Intra-PJM Tariffs, OA, 18.6 Amendment (1.0.0), § 18.6.

[178] 2019 DEA Rehearing Order, 168 FERC ¶ 61,121 at P 8 (citing PJM First Compliance Order, 142 FERC ¶ 61,214 at P 280); *see also* PJM Designated Entity Agreement Order, 148 FERC ¶ 61,187 at PP 46-47 (stating that, although incumbent transmission owners are signatories of the Consolidated Transmission Owners Agreement, acceptance of the Designated Entity Agreement was based on the Designated Entity Agreement applying in full to all Designated Entities, whether an incumbent

process was completed as of 2015; at that time, the "accepted tariff revisions, including the definition of Designated Entity, became the rate in effect."[179]  Unless and until changed through a proceeding where the requisite evidentiary burdens are met,[180] PJM must abide by the currently-effective and Commission-approved terms of the Operating Agreement, terms that it proposed and the Commission accepted as consistent with or superior to Order No. 1000's requirements.

70.     Lastly, we do not consider or rely on PJM's "extrinsic evidence" to determine the meaning of section 1.5.8.[181]  PJM contends that several statements in its Order No. 1000 compliance filings provide evidence that Designated Entity Agreement requirements apply only to projects that are selected in a competitive proposal window, not to all projects planned under Schedule 6, section 1.5.8.[182]  PJM likewise points to the "regulatory context" of these filings, explaining that Order No. 1000's "focus" was on transmission facilities "selected in the regional transmission plan for purposes of cost allocation,"[183] that the Commission once described Designated Entity Agreements as a product of PJM's competitive proposal window process,[184] and that the *pro forma* Designated Entity Agreement's first "whereas" clause reflects that PJM and the

---

transmission owner or a nonincumbent transmission developer, that are designated an RTEP project).

[179] 2022 Rejection Order, 178 FERC ¶ 61,083 at P 26.

[180] *See id.* PP 26-27.

[181] *Papago Tribal Util. Auth. v. FERC*, 723 F.2d 950, 955 (D.C. Cir. 1983) (affirming refusal to consider extrinsic evidence where Commission found that contract language is not reasonably susceptible to the interpretation offered by the offeror of the evidence); *Iberdrola Renewables, Inc. v. FERC*, 597 F.3d 1299, 1304 (D.C. Cir. 2010) (same).

[182] *See* PJM 206 Filing at 24-27.

[183] *See id.* at 24 & n.71 (quoting Order No. 1000, 136 FERC ¶ 61,051 at P 318).

[184] *See id.* at 24 & n.73; *see also* PJM Designated Entity Agreement Order, 148 FERC ¶ 61,187 at P 46 ("[T]he Designated Entity Agreement defines the rights and obligations of all Designated Entities that are designated by PJM to construct an RTEP project *pursuant to PJM's competitive process* set forth in Schedule 6[.]" (emphasis modified)).

counterparty are entering into the agreement "in accordance with Order No. 1000."[185] But if the Operating Agreement "is not ambiguous, extrinsic evidence cannot be used as an aid to interpretation."[186]  Because we find, as discussed above, that section 1.5.8 is not ambiguous in describing when Designated Entity Agreement requirements apply, we do not consider or rely on PJM's "extrinsic evidence."

71.    Therefore, with two exceptions, discussed next, we grant the Complaint.  We find that the currently effective Operating Agreement requires that incumbent transmission owners designated as Designated Entities by PJM to construct Immediate-need Reliability Projects, Short-term Projects, and Long-lead Projects and Economic Based Enhancements or Expansions sign a Designated Entity Agreement and provide security to PJM.  To the extent that PJM has not executed Designated Entity Agreements in all situations required by the Operating Agreement, as detailed in this order, we find that PJM has violated the Operating Agreement's requirements.  As discussed in more detail below, we are establishing a paper hearing proceeding to develop a record on which to determine what, if any, remedial actions are required or appropriate to address these Operating Agreement violations.  Going forward, for all RTEP projects that, per this order's clarifications, require a Designated Entity Agreement when the PJM Board designates a Designated Entity, PJM must, pursuant to section 1.5.8(i), notify the entity that has been designated as the Designated Entity within 15 business days of the PJM Board's approval of the RTEP, and include in such notice the needed in-service date of the project and a date by which all necessary state approvals should be obtained to meet that in-service date.[187]  Then, after the entity designated by PJM accepts its Designated Entity designation and submits to PJM a proposed development schedule that includes development milestones, PJM must, pursuant to section 1.5.8(j):  (1) notify the Designated Entity of any issues with that development schedule; and (2) tender to the Designated Entity an executable Designated Entity Agreement setting forth the rights and obligations of the parties.[188]

---

[185] *See* PJM 206 Filing at 13-14 (citing PJM, Intra-PJM Tariffs, OATT Attachment KK (0.1.0) (Form of Designated Entity Agreement)).

[186] *Consol. Gas Transmission Corp. v. FERC*, 771 F.2d 1536, 1544 (D.C.Cir.1985).

[187] *See* PJM, Intra-PJM Tariffs, OA, Schedule 6 Sec 1.5 (28.0.0), § 1.5.8(i) (Notification of Designated Entity).

[188] *See* PJM, Intra-PJM Tariffs, OA, Schedule 6 Sec 1.5 (28.0.0), § 1.5.8(j) (Acceptance of Designation).

Document Accession #: 20240725-3020          Filed Date: 07/25/2024

ii.    <u>**Reliability Violations on Transmission Facilities Below 200 kV and Thermal Reliability Violations on Transmission Substation Equipment**</u>

72.    We deny the Complaint as it pertains to two specific types of projects, governed by Schedule 6, section 1.5.8(n) and section 1.5.8(p), respectively. In these two circumstances, we agree with ITOs and PJM's argument[189] and find that the Operating Agreement does not require PJM to execute a Designated Entity Agreement.[190]

73.    Specifically, Schedule 6, section 1.5.8(n) (Reliability Violations on Transmission Facilities Below 200 kV) and section 1.5.8(p) (Thermal Reliability Violations on Transmission Substation Equipment) do not use the term "Designated Entity."

> (n)    **Reliability Violations on Transmission Facilities Below 200 kV.** . . . If the Office of the Interconnection determines that the identified reliability violations do not satisfy [one] of . . . two [specified] exceptions . . ., the Office of the Interconnection shall develop a solution to address the reliability violation on below 200 kV Transmission Facilities that will not be included in a proposal window pursuant to the Operating Agreement, Schedule 6, section 1.5.8(c).
>
> . . .
>
> The descriptions shall include an explanation of the decision to not include the below 200 kV reliability violation(s) in Operating Agreement, Schedule 6, section 1.5.8(c) proposal window, a description of the facility on which the violation(s) is found, the Zone in which the facility is located, and notice

---

[189] *See* ITOs Comments on Complaint, Docket No. EL22-80-000, at 17; ITOs Comments on PJM 206 Filing, Docket No. EL22-85-000, at 14; PJM 206 Filing at 30.

[190] Complaint at 1-3 (contending that PJM's alleged failure to execute a Designated Entity Agreement with the Designated Entity "for each Regionally Planned Project" or "for all Regionally Planned Projects" violates the PJM Operating Agreement). Although "Regionally Planned Projects" is not a term used in section 1.5.8, we understand the Complaint to argue that Designated Entity Agreements are required for all projects approved pursuant to section 1.5.8, including all Long-lead Projects, Short-term Projects, and Immediate-need Reliability Projects, whether or not they are proposed through a competitive proposal window and whether or not they are included in the RTEP for purposes of cost allocation. *See* Complaint at 2 nn.3, 9; *see also* PJM 206 Filing at 4, 16 & n.9.

that such construction responsibility for and ownership of the project that resolves such below 200 kV reliability violation will be designated to the incumbent Transmission Owner . . . .[191]

(p)  **Thermal Reliability Violations on Transmission Substation Equipment.** . . . If the Office of the Interconnection determines that the identified thermal reliability violations satisfy the above exemption to the proposal window process, the Office of the Interconnection shall post on the PJM website for review and comment by the Transmission Expansion Advisory Committee and other stakeholders descriptions of the transmission substation equipment thermal reliability violations that will not be included in a proposal window pursuant to Operating Agreement, Schedule 6, section 1.5.8(c).  The descriptions shall include an explanation of the decision to not include the transmission substation equipment thermal reliability violation(s) in Operating Agreement, Schedule 6, section 1.5.8(c) proposal window, a description of the facility on which the thermal violation(s) is found, the Zone in which the facility is located, and notice that such construction responsibility for and ownership of the project that resolves such transmission substation equipment thermal violations will be designated to the incumbent Transmission Owner . . . .[192]

74.    We find that the absence of the defined term Designated Entity is important in interpreting these provisions.  Instead of using that term, these provisions, as noted above, state that the referenced projects "will be designated to the incumbent Transmission Owner" when not subject to a competitive proposal window.[193]  As such,

---

[191] PJM, Intra-PJM Tariffs, OA, Schedule 6 Sec 1.5 (28.0.0), § 1.5.8(n) (Reliability Violations on Transmission Facilities Below 200 kV).

[192] PJM, Intra-PJM Tariffs, OA, Schedule 6 Sec 1.5 (28.0.0), § 1.5.8 (p) (Thermal Reliability Violations on Transmission Substation Equipment).

[193] *See* PJM, Intra-PJM Tariffs, OA, Schedule 6 Sec 1.5 (28.0.0), § 1.5.8(n) (Reliability Violations on Transmission Facilities Below 200 kV); *id.* §1.5.8(p) (Thermal Reliability Violations on Transmission Substation Equipment).  These provisions were added in 2016 and 2017 after the last Commission order on PJM's Order No. 1000 compliance filings.  *Compare PJM Interconnection, L.L.C.*, 156 FERC ¶ 61,132,

for transmission projects planned pursuant to section 1.5.8 that address reliability violations on transmission facilities below 200 kV and/or thermal reliability violations on transmission substation equipment, as detailed in section 1.5.8(n) and (p), respectively, and for which no competitive proposal window is opened, there is no Designated Entity. And because there is no Designated Entity in these instances, the notification of designation and acceptance of designation requirements in sections 1.5.8(i) and 1.5.8(j), which use the term Designated Entity, do not apply. Therefore, a Designated Entity Agreement need not be executed, and Designated Entity Agreement-related security need not be provided under Schedule 6, sections 1.5.8(n) and (p).

75.     We thus agree with PJM's argument that it is notable that PJM did not use the term "Designated Entity" in proposing the language that became Schedule 6, section 1.5.8(n) and section 1.5.8(p).[194] But we note that this fact also reinforces our conclusion above that section 1.5.8 requires Designated Entity Agreements to be signed for RTEP projects for which a Designated Entity has been identified. In other words, we agree with PJM that the fact that the Operating Agreement does not use the defined term "Designated Entity" in section 1.5.8(n) and section 1.5.8(p) is a meaningful variation, from which we infer that the Operating Agreement's use of the defined term "Designated Entity" in other sections, such as section 1.5.8(g), is deliberate.[195] This textual distinction helps to explain why other sections of Schedule 6, such as section 1.6(b) and section 1.7(c), distinguish between Transmission Owner(s) and Designated Entities, as in some instances there is a meaningful difference between the terms.[196]

76.     In sum, we deny the Complaint as it relates to transmission projects planned pursuant to Operating Agreement Schedule 6, section 1.5.8 for which: (1) no competitive

---

at PP 33-42 (2016) (regarding section 1.5.8(n)), *and PJM Interconnection, L.L.C.*, Docket No. ER17-1619-001 (Oct. 11, 2017) (delegated order) (regarding section 1.5.8(p)), *with PJM Interconnection, L.L.C.*, 151 FERC ¶ 61,250 (2015) (Fourth PJM Compliance Order), *and* 2022 DEA Rejection Order, 178 FERC ¶ 61,083 at P 2 & n.2.

[194] PJM 206 Filing at 30; *see also* ITOs Comments on Complaint, Docket No. EL22-80-000, at 17 (arguing that because section 1.5.8(n) and section 1.5.8(p) "do not even mention the term 'Designated Entity' at all," that omission must have meaning).

[195] *See Segar v. Muksaey*, 508 F.3d 16, 22 (D.C. Cir. 2007) (aiming to interpret all parts of a contract together) (citations omitted); *Manti Holdings, LLC v. Authentix Acquisition Co., Inc.*, 261 A.3d 1199, 1208 (Del. 2021) (same).

[196] *See* PJM, Intra-PJM Tariffs, OA, Schedule 6 Sec 1.6 (4.0.0), § 1.6(b) (Approval of the Final Regional Transmission Expansion Plan); PJM, Intra-PJM Tariffs, OA, Schedule 6 Sec 1.7 (3.0.0), § 1.7(c) (Obligation to Build); *see also* ITOs Comments on Complaint, Docket No. EL22-80-000, at 17-18.

proposal window is opened; and (2) the transmission project addresses reliability
violations on transmission facilities below 200 kV and/or thermal reliability violations on
transmission substation equipment.  In these limited circumstances, we find that the
Operating Agreement does not require that the incumbent transmission owner to whom
the project is designated execute a Designated Entity Agreement with PJM.

## 2.    PJM 206 Filing

### a.    PJM's Contention that the Operating Agreement is Unjust and Unreasonable Because it is Overly Broad and Imprecise

77.    We now turn to the PJM 206 Filing.  In the PJM 206 Filing, PJM argues that the
"Designated Entity" definition and Schedule 6, section 1.5.8 of the Operating Agreement
are unjust and unreasonable because their use of the term "Designated Entity" is overly
broad and imprecise.[197]  Having found, however, that the relevant provisions of the
Operating Agreement are clear, we disagree with PJM's assertions that the language in
the "Designated Entity" definition and Schedule 6, section 1.5.8 is so broad, imprecise, or
vague that it creates reasonable confusion about when Designated Entity Agreements are
required.  To the extent that PJM repeats arguments in the PJM 206 Filing that PJM made
in either of its answers to the Complaint, we have addressed those arguments above and
will not repeat those responses a second time here.

### b.    Whether Imposing Security Requirements for Unsponsored Projects Included in PJM's RTEP is Unjust, Unreasonable, or Unduly Discriminatory or Preferential

78.    As relevant here, PJM's governing documents impose two relevant security
requirements on projects designated to a Designated Entity.  First, Schedule 6,
section 1.5.8(j) of the Operating Agreement requires that, to retain its status as a
Designated Entity, within 60 days of receiving an executable Designated Entity
Agreement (or other such period as mutually agreed upon by PJM and the Designated
Entity), the Designated Entity (both existing transmission owners and nonincumbent
transmission developers) shall submit to PJM a letter of credit as determined by PJM to
cover the incremental costs of construction resulting from reassignment of the project.[198]
Second, section 3.0 of PJM's *pro forma* Designated Entity Agreement states that, in
accordance with Schedule 6, section 1.5.8(j), the Designated Entity shall provide and

---

[197] PJM 206 Filing at 1.

[198] PJM, Intra-PJM Tariffs, OA, Schedule 6 Sec 1.5 (28.0.0), § 1.5.8(j)
(Acceptance of Designation).

maintain a letter of credit in the amount of 3% of the estimated cost of the project.[199]  We refer to these requirements together as the Designated Entity Agreement-related security requirements.

79.     In the PJM 206 Filing, PJM argues that interpreting the Operating Agreement to apply the Designated Entity Agreement-related security requirements to all projects governed by section 1.5.8 is unjust, unreasonable, or unduly discriminatory because it would increase costs without sufficient offsetting benefit.[200]  We find, as discussed below, that PJM has demonstrated that its existing Operating Agreement is unjust and unreasonable with respect to the requirement for incumbent transmission owners to provide Designated Entity Agreement-related security in two specific circumstances: (1) for PJM chosen-unsponsored projects, and (2) for projects, designated to an incumbent transmission owner or to more than one incumbent transmission owner, that were chosen through a competitive proposal window during which no nonincumbent transmission developer submitted a competing proposal.  For purposes of this order, we refer to this second set of projects as "incumbent-proposal only projects."  Our finding with respect to these two circumstances is limited to Designated Entity Agreement-related security requirements.  That is, we do not agree with PJM that the incumbent transmission owner in these circumstances should be exempted from the requirement to execute a Designated Entity Agreement containing appropriate terms and conditions.

80.     Except for these two circumstances noted above, we find that it is just and reasonable for PJM to require Designated Entity Agreement-related security for projects designated to incumbent transmission owners; this includes, as discussed below, PJM-chosen sponsored projects that PJM designates to an incumbent transmission owner after a competitive proposal window closes because PJM's regional cost allocation method allocates that project's costs entirely to the incumbent transmission owner's zone.

81.     Below, we summarize arguments in the Complaint, PJM 206 Filing, and responsive pleadings in both dockets that address whether it is unjust, unreasonable, or unduly discriminatory or preferential to impose Designated Entity Agreement-related security requirements on PJM-chosen unsponsored projects and incumbent-proposal only projects.  We first summarize arguments that oppose imposing those security requirements, and then summarize arguments that support imposing those security requirements.

---

[199] PJM, Intra-PJM Tariffs, OATT Attachment KK (0.1.0) (Form of Designated Entity Agreement).

[200] PJM 206 Filing at 21.

i.  **Arguments Opposing Designated Entity
Agreement-related Security Requirements for
PJM-chosen Unsponsored Projects**

82.    PJM contends that even if the Operating Agreement requires Designated Entity
Agreements for all RTEP projects planned under Schedule 6, section 1.5.8,[201] such an
expansive use of Designated Entity Agreements would be unjust and unreasonable, and
exceeds the scope of Order No. 1000's reforms.[202]  In particular, PJM contends that such
a broad requirement would increase costs to PJM load due to the Designated Entity
Agreement-related security requirements, without providing sufficient offsetting
benefits.[203]

83.    PJM also argues that imposing Designated Entity Agreement requirements on all
RTEP projects would not provide consumer protections, as some commenters contend,
and that in any event, this proceeding is not an appropriate forum for expanding
Designated Entity Agreement requirements beyond the scope of Order No. 1000's
reforms.[204]

84.    PJM asserts that a Designated Entity Agreement's fundamental purposes are to
establish a contractual relationship between PJM and a nonincumbent transmission
developer who is ineligible to sign the Consolidated Transmission Owners Agreement, to
define the rights and responsibilities of PJM and the nonincumbent transmission
developer, and to provide for a "level playing field" between incumbent transmission
owners and nonincumbent transmission developers competing for the same project in a
competitive window process.[205]  Designated Entity Agreements, PJM states, do not
provide any additional consumer protections for projects assigned to an incumbent
transmission owner, do not provide for any additional cost transparency, do not provide
for additional PJM evaluation, and do not provide construction schedule assurances not

---

[201] *See id.* at 20-21 (citing in part Complaint at 3-4, Docket No. EL22-80-000).

[202] *Id.* at 21.

[203] *Id.* at 21-22 (citations omitted); PJM Answer to Complaint, Docket
No. EL22-80-000, at 22.

[204] PJM Second Answer, Docket Nos. EL22-80-000 and EL22-85-000, at 5; *see
also id.* at 11-25.

[205] *Id.* at 13.

otherwise provided for by the Consolidated Transmission Owners Agreement or by PJM through its RTEP processes.[206]

85.     According to PJM, Designated Entity Agreement-related security requirements were added to the Designated Entity Agreement for two reasons. First, PJM contends that they insure against the financial risk borne by an incumbent transmission owner who must assume construction and cost responsibility in the event that a nonincumbent transmission developer defaults on or abandons a designated project in the incumbent transmission owner's zone, a situation that PJM says is not applicable to all RTEP projects.[207] PJM further states that incumbent transmission owners are contractually obligated to build reliability projects, and are legally obligated to provide safe and reliable electric service to customers, meaning that incumbent transmission owners are prohibited by contract and law from abandoning RTEP projects. Thus, according to PJM, imposing security requirements on incumbent transmission owners, who are unable to abandon a project, increases that project's cost without any cognizable benefit.[208]

86.     Second, in the event that the nonincumbent transmission developer defaults on its obligations under its Designated Entity Agreement, PJM contends that security protects customers by ensuring that the incremental costs of construction resulting from the

---

[206] PJM Answer to Complaint, Docket No. EL22-80-000, at 25-26; PJM Second Answer, Docket Nos. EL22-80-000 and EL22-85-000, at 14; *see also* PJM Answer to Complaint, Docket No. EL22-80-000, at 25-26; PJM Second Answer, Docket Nos. EL22-80-000 and EL22-85-000, at 18-20 (asserting that cost transparency and project updates are provided for all RTEP projects though PJM's Transmission Expansion Advisory Committee process, not through Designated Entity Agreements); PJM Second Answer, Docket Nos. EL22-80-000 and EL22-85-000, at 21-22 (asserting that PJM re-evaluates all RTEP projects as part of its regional transmission planning processes). PJM also argues that cost containment protections are included in Designated Entity Agreements only where voluntarily proposed by the Designated Entity and argues that Joint Protestors overstate the importance of project construction and in-service milestones, which can be (and have been) extended for various valid reasons. *See id.* at 20-21, 22-25.

[207] PJM Answer to Complaint, Docket No. EL22-80-000, at 23-24; PJM Second Answer, Docket Nos. EL22-80-000 and EL22-85-000, at 14-15.

[208] PJM Answer to Complaint, Docket No. EL22-80-000, at 24-25; PJM Second Answer, Docket Nos. EL22-80-000 and EL22-85-000, at 15-16; *see also* PJM Second Answer, Docket Nos. EL22-80-000 and EL22-85-000, at 16 n.69 (stating that to date, including the years before the existence of the *pro forma* Designated Entity Agreement, no incumbent transmission owner has abandoned or defaulted on a project under the Consolidated Transmission Owners Agreement).

project's reassignment to the incumbent transmission owner are covered by the
nonincumbent transmission developer rather than by customers.[209]  PJM argues that
Designated Entity Agreement-related security requirements do not serve this purpose for
projects that have been designated to an incumbent transmission owner, as is the case for
PJM-chosen unsponsored projects under Schedule 6, sections 1.5.8 (g), (h), (*l*), and
(m)(1), because the incumbent transmission owner is obligated to construct the project
under the Consolidated Transmission Owners Agreement.[210]  Thus, according to PJM,
there is no default protection required for unsponsored projects under sections 1.5.8(g),
(h), (*l*), and (m)(1).[211]

87.    PJM recognizes that Designated Entity Agreement-related security requirements
apply to both incumbent transmission owners and nonincumbent transmission developers
for transmission projects chosen through the competitive proposal window and selected
in the regional transmission plan for purposes of cost allocation to ensure that, in the
competitive context, "similarly situated transmission developers, whether incumbent
transmission owners or nonincumbent developers, will be processed in a not unduly
discriminatory manner consistent with Order No. 1000."[212]  For these projects, PJM
estimates that the range of total costs associated with maintaining letters of credit would
be between $330,000 and $870,000.[213]

88.    PJM contends, however, that total letter of credit maintenance costs would be
significantly more if other types of RTEP projects are also subject to Designated Entity

---

[209] PJM 206 Filing at 21-23 (citations omitted); PJM Answer to Complaint, Docket
No. EL22-80-000, at 25.

[210] PJM 206 Filing at 21-23; PJM Answer to Complaint, Docket No. EL22-80-000,
at 25.

[211] PJM 206 Filing at 22-23; PJM Answer to Complaint, Docket No. EL22-80-000,
at 25.

[212] PJM Second Answer, Docket Nos. EL22-80-000 and EL22-85-000, at 16
(citing 2018 DEA Order, 164 FERC ¶ 61,021 at P 30); *see also* PJM Answer to
Complaint, Docket No. EL22-80-000, at 24 (citing 2018 DEA Order, 164 FERC ¶ 61,021
at PP 28, 33 & n.61; 2019 DEA Rehearing Order, 168 FERC ¶ 61,121 at P 12 n.23).

[213] PJM Second Answer, Docket Nos. EL22-80-000 and EL22-85-000, at 17.  The
estimates are based on the January 2022 London Interbank Offered Rate (LIBOR) using
an annual interest rate of 2.2%.  PJM states that the letter of credit is required from the
date the executed Designated Entity Agreement is returned to PJM until several months
after an RTEP project is placed into service, which generally spans a timeframe of three
to eight years.  *Id.* n.72.

Agreement-related security requirements.  Specifically, PJM estimates that the range of total costs would increase to between $4.28 million and $11.42 million if Designated Entity Agreement-related security requirements apply to all RTEP projects chosen through a competitive proposal window but that are not selected in the regional transmission plan for purposes of cost allocation, and that total costs would increase further to between $64.12 million and $170.99 million in total if such requirements apply to all RTEP projects.[214]

89.     ITOs contend that requiring PJM to issue, negotiate, and administer hundreds of Designated Entity Agreements would increase costs for customers and impose additional burden and expense on PJM and transmission owners with no demonstrable benefit.[215] The additional costs of providing security, ITOs argue, are not justified, particularly because no incumbent transmission owner in PJM has ever defaulted on its obligation to construct an RTEP project.[216]  ITOs claim that without a credible showing of harm to consumers from PJM's historical practices or an explanation of how Designated Entity

---

[214] *See* PJM Second Answer, Docket Nos. EL22-80-000 and EL22-85-000, at 16-17.  PJM alleges that, given current interest rates, consumer costs would be much higher now as the annual LIBOR rate is more than double January's rate, at around 4.8%. *Id.* at 17 n.71.

[215] ITOs Comments on Complaint, Docket No. EL22-80-000, at 3, 5, 18-20; ITOs Comments on PJM 206 Filing at 16-17 (highlighting the *pro forma* Designated Entity Agreement's security, milestone, insurance, and assignment requirements, among other obligations, and citing PJM's additional cost estimates); Data Center Coalition Comments on PJM 206 Filing, Docket No. EL22-85-000, at 3 (appreciating PJM's concerns that broadly applying Designated Entity Agreement requirements could be administratively burdensome and may not provide commensurate value).

[216] ITOs Comments on Complaint, Docket No. EL22-80-000, at 19-20; ITOs Comments on PJM 206 Filing at 17.  ITOs also contend that increasing development costs for RTEP projects designated to incumbent transmission owners outside of competitive solicitation processes or for RTEP projects whose costs are not regionally allocated would be particularly unwarranted because the Consolidated Transmission Owners Agreement's obligation to build requirements apply to such projects.  *See* ITOs Comments on Complaint, Docket No. EL22-80-000, at 22 n.61 (citing in part PJM, Rate Schedules, TOA Rate Schedule 42, TOA 42 Article 4 Section 4.2 (Option to Build) (0.0.0)).

Agreements provide increased cost transparency, the notion that Designated Entity Agreement requirements provide important protections for consumers is illusory.[217]

### ii. Arguments Supporting Designated Entity Agreement-related Security Requirements for PJM-chosen Unsponsored Projects

90.     Complainants contend that Designated Entity Agreement requirements provide important consumer protections and are advisable as a matter of policy.  Specifically, Complainants highlight that Designated Entity Agreements require transmission developers to provide and adhere to project development milestones, delineate events that can lead to breach of the agreement, and impose security requirements on a Designated Entity.[218]  Complainants also contend that if Designated Entity Agreements are used for Immediate-need Reliability Projects, PJM would need to reevaluate whether a different project is needed if an Immediate-need Reliability Project's anticipated in service date is after the projected need by date.[219]  Lastly, Complainants contend that Designated Entity Agreements provide cost transparency.[220]

91.     OPSI contends that Commission precedent recognizes that Designated Entity Agreements have consumer benefits.[221]  OPSI argues that allowing PJM to depart from the Operating Agreement provisions would harm consumers by forgoing an important tool that preserves reliability, reduces operational risk, and controls costs.[222]  Finally,

---

[217] ITOs Comments on Complaint, Docket No. EL22-80-000, at 20-22.  ITOs further assert that Complainants misunderstand PJM's project reevaluation processes. *See id.* at 21-22.

[218] Complaint at 20; *see also id.* at 10-12 (discussing relevant provisions of PJM's *pro forma* Designated Entity Agreement).

[219] *See* Complaint at 20; *see also* PJM, Intra-PJM Tariffs, OA, Schedule 6 Sec 1.5 (28.0.0), § 1.5.8(k) (Failure of Designated Entity to Meet Milestones).

[220] Complaint at 20-21.

[221] *See* OPSI Comments on Complaint, Docket No. EL22-80-000, at 4 (citing *Pa. Water and Power Co. v. FPC*, 343 U.S. 414, 418 (1952); *New England Power Generators Ass'n v. ISO New England Inc.*, 146 FERC ¶ 61,038 at P 26 & n.33 (2014); *Atl. Refin. Co. v. Pub. Serv. Comm'n*, 360 U.S. 378, 388-89 (1959); *FPC v. Hope Nat. Gas Co.*, 320 U.S. 591, 610-12 (1944); *Mun. Light Bds. of Reading & Wakefield, Mass. v. FPC*, 450 F.2d 1341, 1348 (D.C. Cir. 1971)).

[222] *See* OPSI Comments on Complaint, Docket No. EL22-80-000, at 5.

OPSI questions whether such a result would raise questions of misalignment with Order No. 2000's principles, which include fostering light-handed regulations.[223]

92.     Data Center Coalition argues that increased measures for transmission cost transparency and cost containment are necessary to protect customers from excessive transmission costs and to ensure that transmission rates are just and reasonable.[224]  Data Center Coalition states that many of its members have located data centers in Northern Virginia, where PJM has identified thousands of megawatts of additional future load growth and proposed several Immediate-need Reliability Projects currently estimated to cost over $800 million.[225]  Data Center Coalition argues that requiring Designated Entity Agreements for such projects would be an important step toward improving transmission cost transparency and cost containment in PJM.[226]  Data Center Coalition further argues that the Commission has already found that the Consolidated Transmission Owners Agreement does not provide comparable protections,[227] though Data Center Coalition recognizes that Designated Entity Agreements do not always provide explicit cost containment terms.[228]  Finally, because of the potential for competition between incumbent transmission owners and nonincumbent transmission developers, Data Center Coalition also disputes that imposing security requirements on

---

[223] *See id.* at 4 (citing *Reg'l Transmission Orgs.*, Order No. 2000, FERC Stats. & Regs. ¶ 31,089 at 31,027-28 (1999) (cross-referenced at 89 FERC ¶ 61,285) (discussing "the concept of light-handed regulation" and related issues), *order on reh'g*, Order No. 2000-A, FERC Stats. & Regs. ¶ 31,092, at 31,392 (2000) (cross-referenced at 90 FERC ¶ 61,201) (addressing those issues on rehearing), *aff'd sub nom. Pub. Util. Dist. No. 1 of Snohomish Cnty. v. FERC*, 272 F.3d 607 (D.C. Cir. 2001).

[224] Data Center Coalition Comments on Complaint, Docket No. EL22-80-000 at 1, 3.

[225] *Id.* at 2, 4-5.  Data Center Coalition further contends that while investment of this magnitude may be necessary to ensure reliable service, it also highlights the critical need for cost transparency and cost containment.  *Id.* at 5.

[226] *Id.* at 2, 5; *see also* Data Center Coalition Comments on PJM 206 Filing, Docket No. EL22-85-000, at 2, 6.

[227] Data Center Coalition Comments on Complaint, Docket No. EL22-80-000, at 3-4 (citing 2018 DEA Order, 164 FERC ¶ 61,021 at P 33).

[228] *See* Data Center Coalition Comments on PJM 206 Filing, Docket No. EL22-85-000, at 2.

all Immediate-need Reliability Project developers would lead to unjust or unreasonable results.[229]

93.    Joint Protestors contend that Designated Entity Agreement-related security requirements provide long-term benefits for consumers, which is contrary to PJM's claim that Designated Entity Agreements exist solely for the benefit of certain incumbent transmission owners. Thus, Joint Protestors argue that Designated Entity Agreements should be universally enforced.[230]  Joint Protestors contend that PJM fails to acknowledge the benefits provided by requiring incumbent transmission owners to post security, given Commission precedent finding that incumbent transmission owners may fail to construct projects by projected in-service dates or otherwise default on project construction commitments.[231]  In addition to cost transparency and project reevaluation benefits, Joint Protestors argue that Designated Entity Agreements go above and beyond the Consolidated Transmission Owners Agreement's requirements by requiring Designated Entities to achieve project milestones by specified dates, where failure to meet such deadlines can be considered a breach of contract.[232]

94.    Joint Protestors also assert that PJM's proposed replacement rate is unsupported and should not be adopted,[233] in part because it does not require Designated Entity Agreements for most RTEP projects, which would forgo the consumer protections that Designated Entity Agreements provide.[234]  Joint Protestors assert that PJM provides no basis for its proposed distinction between Immediate-need Reliability Projects chosen through competitive proposal windows and those that are not, and thus PJM has provided no historical evidence or factual showing of need to support its proposal to amend Schedule 6, section 1.5.8(m)(1).[235]  Joint Protestors contend that adopting PJM's replacement rate would unjustifiably decrease accountability and competition, and would

---

[229] *Id.* at 6-7 (citing PJM 206 Filing at 21-23).

[230] Joint Protest, Docket Nos. EL22-80-00 and EL22-85-000, at 7-8.

[231] *See id.* at 8-9 (quoting 2018 DEA Order, 164 FERC ¶ 61,021 at P 41).

[232] *See* Joint Protest, Docket Nos. EL22-80-00 and EL22-85-000, at 9-10, 18-19; *see also id.* at 16-17 (citing 2018 DEA Order, 164 FERC ¶ 61,021 at PP 18-26).

[233] *Id.* at 2, 18, 20-21.

[234] *Id.* at 17, 19, 22.

[235] *Id.* at 18.

shift responsibility for regional transmission planning away from PJM onto incumbent transmission owners.[236]

### iii.     Commission Determination

95.     We find that imposing Designated Entity Agreement-related security requirements on the Designated Entity for a PJM-chosen unsponsored project is unjust and unreasonable because it is not required to ensure comparability between incumbent transmission owners and nonincumbent transmission developers nor to insure against the incremental costs of reassigning a transmission project designated to a nonincumbent transmission developer and, therefore, it increases costs to customers without providing commensurate benefits.  Similarly, we find that imposing Designated Entity Agreement-related security requirements on incumbent-proposal only projects is unjust and unreasonable for the same reasons.  Accordingly, we direct PJM to submit a compliance filing to remove Designated Entity Agreement-related security requirements from its governing documents for Designated Entities for PJM-chosen unsponsored projects and incumbent-proposal only projects.

96.     Commission precedent and PJM's governing documents articulate two principal rationales that support imposing Designated Entity Agreement-related security requirements.  As detailed below, neither rationale applies to either PJM-chosen unsponsored projects or incumbent-proposal only projects.  Because neither rationale supports the need to impose a security requirement on incumbent transmission owners for PJM-chosen unsponsored projects or incumbent-proposal only projects, these requirements serve only to raise the cost of construction of transmission facilities for customers.

97.     The first rationale is comparability.  In the 2018 DEA Order, the Commission emphasized the importance of a level playing field between similarly-situated nonincumbent transmission developers and incumbent transmission owners any time those entities compete for the same project opportunities.[237]  In particular, the Commission explained that *pro forma* development agreements are just and reasonable

---

[236] *Id.* at 21.

[237] *See* 2018 DEA Order, 164 FERC ¶ 61,021 at PP 29-35; 2019 DEA Rehearing Order, 168 FERC ¶ 61,121 at P 19.  In particular, the Commission stated that, "the relevant inquiry in determining whether the two categories of transmission developer were similarly situated is whether [the public utility transmission provider] will evaluate the proposed transmission projects of these entities using the same criteria for the purpose of identifying the more efficient or cost-effective solution and thus for selection in the regional transmission plan for purposes of cost allocation."  2018 DEA Order, 164 FERC ¶ 61,021 at P 31 (citing NYISO 2018 Order, 162 FERC ¶ 61,124 at P 11).

and not unduly discriminatory or preferential under two circumstances.[238]  The first circumstance is when both the incumbent transmission owners and the nonincumbent transmission developers are subject to the *pro forma* development agreement.[239]  The second circumstance is when, if incumbent transmission owners are not subject to the *pro forma* development agreement, the public utility transmission provider has demonstrated that the terms and conditions of the *pro forma* development agreement are comparable to the terms and conditions of the applicable Regional Transmission Organization or Independent System Operator governing documents and agreements with which incumbent transmission owners must comply.[240]

98.    As the Commission reiterated in the 2019 DEA Rehearing Order, "when transmission developers, here both incumbent transmission owners and nonincumbent transmission developers, are competing for the same opportunity subject to the same set of criteria, those developers should be subject to comparable rules *for the entirety of that competitive process*."[241]  Therefore, in reviewing Designated Entity Agreement requirements, the Commission "considers whether the terms of any agreement could result in undue discrimination both *in seeking selection* in the regional transmission plan for purposes of cost allocation and remaining selected."[242]

99.    As applied to Designated Entity Agreement-related security requirements, comparability requires that, when nonincumbent transmission developers and incumbent transmission owners compete for the same opportunity in a competitive proposal window, they should not face meaningfully different financial security expectations.[243]

---

[238] 2018 DEA Order, 164 FERC ¶ 61,021 at P 28.

[239] *Id.* (citing *New York Indep. Sys. Operator, Inc.*, 151 FERC ¶ 61,040 (2015) (Third NYISO Compliance Order requiring a filing of the *pro forma* development agreement); *Cal. Indep. Sys. Operator Corp.*, Docket No. ER14-2824-001 (Feb. 12, 2015) (delegated letter order); *Cal. Indep. Sys. Operator Corp.*, 149 FERC ¶ 61,107 (2014); PJM First Compliance Order, 142 FERC ¶ 61,214 at P 280; PJM Designated Entity Agreement Order, 148 FERC ¶ 61,187 at PP 46-47; *Midcontinent Indep. Sys. Operator, Inc.*, 153 FERC ¶ 61,168, at PP 85,100 (2015)).

[240] 2018 DEA Order, 164 FERC ¶ 61,021 at P 28 (citing *ISO New England Inc.*, 150 FERC ¶ 61,209, *order on reh'g and compliance*, 153 FERC ¶ 61,012, at 20-29 (2015)).

[241] 2019 DEA Rehearing Order, 168 FERC ¶ 61,121 at P 19 (emphasis added).

[242] *Id.* (quotation marks and citation omitted) (emphasis added).

[243] *See* 2018 DEA Order, 164 FERC ¶ 61,021 at P 39 (rejecting PJM's proposal to exempt incumbent transmission owners from the requirement to execute Designated

If, for example, only nonincumbent transmission developers or only incumbent transmission owners (or some other particular subset of similarly-situated transmission developers) were exempt from Designated Entity Agreement-related security requirements, the exempted entities "could reflect the cost savings associated with not having a security requirement in [their] proposal[s]" to PJM, thereby disadvantaging the non-exempted entities in head-to-head competition.[244]  This is because the anticipated costs of meeting Designated Entity Agreement-related security requirements are necessarily reflected in the costs of proposed projects.[245]

100.    The second rationale supporting PJM imposing Designated Entity Agreement-related security requirements relates to the stated purpose of those security requirements in Schedule 6 of the Operating Agreement.  Specifically, Schedule 6, section 1.5.8(j) explains that the purpose of the security requirement is "to cover the incremental costs of construction resulting from reassignment of the project."[246] Reassignment may occur when a Designated Entity defaults on its obligations under the Designated Entity Agreement, including by not meeting required project development milestones or by abandoning the project.[247]  PJM explains that, where projects designated

Entity Agreements because, among other reasons, "the Consolidated Transmission Owners Agreement is less stringent than the Designated Entity Agreement with respect to the issue of financial security and such difference could disadvantage a nonincumbent transmission developer when competing for transmission projects."); *see also Sw. Power Pool, Inc.*, 144 FERC ¶ 61,059, at P 245 (2013) ("We conclude that it is unduly discriminatory to require a demonstration of financial strength from nonincumbent transmission developers as part of the Transmission Owner Selection Process without requiring a similar showing on the part of an incumbent transmission owner.").

[244] *See* 2018 DEA Order, 164 FERC ¶ 61,021 at P 39.

[245] *See* PJM 206 Filing at 22 & n.66 (quoting 2019 DEA Rehearing Order, 168 FERC ¶ 61,121 at P 22).

[246] PJM, Intra-PJM Tariffs, OA, Schedule 6 Sec 1.5 (28.0.0), § 1.5.8(j) (Acceptance of Designation); *see also* First PJM Compliance Order, 142 FERC ¶ 61,214 at P 271 (summarizing comment explaining that a requirement to post security may provide a degree of certainty that costs related to reassignment can be recovered if a project is abandoned or there is a material default); PJM, Third Compliance Filing, Docket No. ER13-198-004, at 12-13 (PJM offering this same interpretation of Schedule 6, section 1.5.8(j) and explaining that section 3.0 of the proposed *pro forma* Designated Entity Agreement implements the requirement in section 1.5.8(j)).

[247] *See* 2018 DEA Order, 164 FERC ¶ 61,021 at PP 9-10, 48-49; PJM 206 Filing at 22-23.

to a Designated Entity must be reassigned, the security provided by the Designated Entity can be accessed and put towards the incremental costs that result when a different transmission developer must assume responsibility and continue developing the project.[248]

101.   But importantly, under Schedule 6, section 1.5.8(k), project reassignment is a binary choice—PJM may either "retain the Designated Entity" to continue developing the project, or it may "designate the Transmission Owner(s) in the Zone(s) where the project is located as Designated Entity(ies)."[249]  When the defaulting Designated Entity is an incumbent transmission owner, however, Schedule 6 does not allow PJM to reassign the project.  Instead, section 1.5.8(k) states that PJM "shall seek recourse through the Consolidated Transmission Owners Agreement or FERC, as appropriate."[250]  This distinction means that, under the Operating Agreement, a project may only be reassigned *to* an incumbent transmission owner, and not away *from* an incumbent transmission owner.[251]  Thus, where the Designated Entity is the incumbent transmission owner, including for PJM-chosen unsponsored projects and incumbent-proposal only projects, there is no reasonable risk of reassignment to another entity.[252]

102.   As applied to the facts here, neither principal rationale supports imposing Designated Entity Agreement-related security requirements on PJM-chosen unsponsored projects.  First, with respect to comparability, PJM-chosen unsponsored projects are not subject to competitive proposal windows.[253]  Instead, for PJM-chosen unsponsored

---

[248] *See* PJM 206 Filing at 22-23.

[249] PJM, Intra-PJM Tariffs, OA, Schedule 6 Sec 1.5 (28.0.0), § 1.5.8(k) (Failure of Designated Entity to Meet Milestones).

[250] PJM, Intra-PJM Tariffs, OA, Schedule 6 Sec 1.5 (28.0.0), § 1.5.8(k) (Failure of Designated Entity to Meet Milestones).

[251] PJM, Intra-PJM Tariffs, OA, Schedule 6 Sec 1.7 (3.0.0), § 1.7 (Obligation to Build); PJM, Rate Schedules, TOA Rate Schedule 42, TOA 42 Article 4 Section 4.2 (Obligation to Build) (0.0.0).  Relatedly, PJM and ITOs state that no RTEP project has ever been reassigned away from an incumbent transmission owner.  *See* PJM Second Answer, Docket Nos. EL22-80-000 and EL22-85-000, at 16 n.69; *see also* ITOs Comments on Complaint EL22-80 at 19-20 (explaining that no incumbent transmission owner has ever defaulted on its obligation to construct an RTEP project); ITOs Comments on PJM 206 Filing, Docket No. EL22-85-000, at 17 (same).

[252] *See* PJM 206 Filing at 20-23.

[253] *See supra* at P 7.

projects, PJM itself identifies the more efficient or cost-effective transmission project to resolve an identified transmission need and selects that transmission project in the regional transmission plan for purposes of cost allocation.  In these cases, PJM is required to designate the incumbent transmission owner as the entity to construct, own, operate, maintain, and finance the transmission project.[254]  As a result, for PJM-chosen unsponsored projects, incumbent transmission owners and nonincumbent transmission developers do not "compet[e] for the same opportunity subject to the same set of criteria," and thus are not similarly-situated for purposes of that project, which, again, is designated outside of a competitive proposal window.[255]

103.    Second, with respect to reassignment, a PJM-chosen unsponsored project, which must be designated to the relevant incumbent transmission owner, will not be reassigned away from that designated incumbent transmission owner absent extenuating circumstances, which are very unlikely.  As noted above, if an incumbent transmission owner that is the Designated Entity for a project defaults on its obligations, PJM is to "seek recourse through the Consolidated Transmission Owners Agreement or FERC, as appropriate," rather than reassign the project to another entity.[256]  Thus, there is very little, if any, potential to incur incremental costs resulting from reassignment for PJM-chosen unsponsored projects given that the Operating Agreement does not provide for reassignment.  In turn, we find that it is unjust and unreasonable to require security, ultimately at customer expense, to insure against potential costs that will rarely, if ever, materialize.

104.    We also find that neither rationale applies to incumbent-proposal only projects—projects for which an incumbent transmission owner is the only entity to submit a proposal or proposals to PJM in a competitive proposal window.  First, with respect to comparability, the Commission has emphasized that what matters most is a level playing field between incumbent transmission owners and nonincumbent transmission developers when those entities compete for the same opportunity subject to the same set of criteria.[257]  Thus, at the outset of each competitive proposal window,

---

[254] *See id*.

[255] 2019 DEA Rehearing Order, 168 FERC ¶ 61,121 at PP 18-19; *see* 2018 DEA Order, 164 FERC ¶ 61,021 at PP 30-32.

[256] *See* PJM, Intra-PJM Tariffs, OA, Schedule 6 Sec 1.5 (28.0.0), § 1.5.8(k).

[257] 2019 DEA Rehearing Order, 168 FERC ¶ 61,121 at PP 18-19 (explaining that "when transmission developers, here both incumbent and nonincumbent transmission developers, are competing for the same opportunity subject to the same set of criteria, those developers should be subject to comparable rules for the entirety of that competitive process.").

comparability requires that both incumbent transmission owners and nonincumbent transmission developers face the same expected Designated Entity Agreement-related security requirements, as those requirements affect the costs of proposals that those competing developers will submit.  But if, in the end, an incumbent transmission owner is the only entity to submit a proposal to PJM during a competitive proposal window, and no nonincumbent transmission developer in fact competed for that opportunity, the situation is different.  An incumbent transmission owner in that instance has not competed against any specific nonincumbent transmission developers for selection of its project by PJM in the RTEP—instead, PJM assessed a proposal or proposals sponsored by only one entity, the incumbent transmission owner.  In this situation, therefore, a security requirement is no longer needed to ensure comparability and merely results in unnecessary costs.  We find that no competitive advantage or disadvantage is gained or imposed at the time of proposal submission by the possibility that Designated Entity Agreement-related security requirements may later be relieved if it turns out that an incumbent transmission owner is the only entity to submit a proposal during a competitive proposal window.

105.     Second, with respect to reassignment, as the project has been designated to an incumbent transmission owner, we reiterate, as explained above, that there is no reasonable potential for PJM to reassign an incumbent-proposal only project to another entity.  Thus, insuring against the costs of a potential reassignment does not justify imposing Designated Entity Agreement-related security requirements for incumbent-proposal only projects.

106.     Some commenters suggest that Designated Entity Agreement-related security requirements themselves provide benefits to consumers or offer some form of consumer protection.[258]  We disagree and do not find that providing security in every context necessarily serves customer interests.  Rather, the reasons for providing security and its associated benefits are context-specific.  As stated, when security provides comparability between competing transmission developers, or insures against the incremental costs of construction that could result from a project's reassignment, we find that providing security ultimately serves customer interests.  But when Designated Entity-related security requirements are applied to PJM-chosen unsponsored projects and incumbent-proposal only projects, those security requirements increase costs to customers without providing any commensurate benefit.  No commenter has provided a persuasive argument to the contrary in this record.

107.     Accordingly, we find that PJM has satisfied its FPA section 206 burden to show that Designated Entity Agreement-related security requirements are unjust and

---

[258] *E.g.*, Joint Protest, Docket Nos. EL22-80-00 and EL22-85-000, at 8-9 (quoting 2018 DEA Order, 164 FERC ¶ 61,021 at P 41); OPSI Comments on Complaint in EL22-80-000 at 4.

unreasonable when applied to PJM-chosen unsponsored projects.  Because that situation in substance is not distinguishable from the incumbent-proposal only project situation (where an incumbent transmission owner is the only entity competing for a transmission development opportunity), we also find that Designated Entity Agreement-related security requirements are unjust and unreasonable when applied to incumbent-proposal only projects.  In both situations, comparability concerns do not apply and there is no reasonable potential for reassignment to another Designated Entity.  Thus, insisting on financial security in those situations lacks a reasonable basis, yet imposes costs on transmission developers that are ultimately borne by transmission customers.  We find such an outcome unjust and unreasonable because it would require customers to pay for unnecessary costs.[259]

108.    In this order, however, we find that PJM has met its FPA section 206 burden only for Designated Entity Agreement-related security requirements as applied to PJM-chosen unsponsored projects or incumbent-proposal only projects.[260]  We disagree with PJM and ITOs that signing Designated Entity Agreements is so burdensome that it makes the requirement to execute one unjust, unreasonable, or unduly discriminatory or preferential.[261]  Instead, we find that these unsupported allegations of administrative burden are insufficient to satisfy PJM's statutory burden under FPA section 206.  The Commission has previously rejected the notion that mere "administrative burden," or "administrative efficiency" justifies exempting incumbent transmission owners from having to execute a Designated Entity Agreement, if that exemption would be unduly discriminatory.[262]  And as other parties contend, there are likely transparency benefits or other benefits from the other Designated Entity Agreement requirements imposed by the Operating Agreement or Tariff,[263] and so our finding here is limited to the existing

---

[259] *Cf. Kinder Morgan Operating L.P. "A"*, 101 FERC ¶ 61,017, at P 5 (2002) (explaining that the imposition of unnecessary costs, whether via tariff provision or cost of service element in a rate proceeding, is unjust and unreasonable).

[260] *See* PJM 206 Filing at 21-22 (identifying Designated Entity Agreement-related security requirements as the cause of "increase[d] consumer costs without sufficient offsetting benefit").

[261] PJM Answer to Complaint, Docket No. EL22-80-000, at 23-24; PJM Second Answer, Docket Nos. EL22-80-000 and EL22-85-000, at 12 n.54; ITOs Comments on PJM 206 Filing at 17.

[262] *See* 2018 DEA Order, 164 FERC ¶ 61,021 at PP 24, 34.

[263] *See, e.g.*, Joint Protest in EL22-85-000 at 10, 16, 18-19; OPSI Comments on Complaint at 4-5; *see also* 2018 DEA Order, 164 FERC ¶ 61,021 at P 41.

Designated Entity Agreement-related security requirements for PJM-chosen unsponsored projects and incumbent-proposal only projects.

109.    Moreover, except for PJM-chosen unsponsored projects and incumbent-proposal only projects, we find that the reassignment and comparability rationales justify imposing Designated Entity Agreement requirements, including Designated Entity Agreement-related security requirements, on the Designated Entity for the projects where the Operating Agreement requires a Designated Entity.[264]  Specifically, security is needed from nonincumbent transmission developers to insure against the potential costs of reassigning a project, and that need for security from nonincumbent transmission developers gives rise to the need to collect security from incumbent transmission owners for comparability reasons when they compete with nonincumbent transmission developers.  PJM notes that, under Schedule 6, section 1.5.8(*l*), it must designate certain transmission projects located solely within a transmission owner's zone whose costs are allocated solely to that zone to the incumbent transmission owner, even if that transmission solution was proposed by a nonincumbent transmission developer during a competitive proposal window.[265]  PJM argues that these transmission projects are outside

---

[264]    We recognize PJM's concerns regarding the potential for "increase[d] consumer costs."  *See supra* note 261.  However, we note that the record in this proceeding supports relieving incumbent transmission owners, when they are required to execute Designated Entity Agreements, from having to provide Designated Entity Agreement-related security only for PJM-chosen unsponsored projects and incumbent-proposal only projects.  Beyond those projects, comparability requires that incumbent transmission owners provide Designated Entity Agreement-related security to ensure a level playing field when competing with nonincumbent transmission developers.  *See* 2018 DEA Order, 164 FERC ¶ 61,021 at P 39.  However, nothing in this record speaks to whether PJM could address its concerns about increased consumer costs, while maintaining comparability, by proposing changes to the Designated Entity Agreement-related security requirements in another proceeding.

[265]    *See* PJM 206 Filing at 11 n.31; PJM Second Answer, Docket Nos. EL22-80-000 and EL22-85-000, at 15-16; *see also* PJM, Intra-PJM Tariffs, OA, Schedule 6, § 1.5.8(*l*) (Transmission Owners Required to be the Designated Entity) (28.0.0) ("[T]he Transmission Owner(s) in whose Zone(s) a project proposed pursuant to the Operating Agreement, . . . is to be located will be the Designated Entity for the project, when the Short-term Project or Long-lead Project is: . . . (ii) located solely within a Transmission Owner's Zone and the costs of the project are allocated solely to the Transmission Owner's Zone.").  PJM has not been requiring the incumbent transmission owners in this circumstance to execute Designated Entity Agreements.  *See* PJM 206 Filing at 30.

of the scope of Order No. 1000's reforms.[266]  While we acknowledge that Order No. 1000 did not require the nonincumbent transmission developer reforms to apply to transmission facilities whose costs are allocated entirely to the incumbent transmission owner's zone, we find that under PJM's currently-effective Operating Agreement, which PJM proposed and the Commission accepted as consistent with or superior to Order No. 1000's requirements, when PJM opens a competitive proposal window, PJM does not know which of the proposals that it receives will be identified as the more efficient or cost-effective solution to the transmission need.  It is only after the competitive proposal window has closed and after PJM has analyzed the submitted transmission projects and identified the more efficient or cost-effective transmission solution that PJM determines the project's cost allocation.[267]  We therefore find that PJM failed to show that it is unjust and unreasonable to require the incumbent transmission owner to sign a Designated Entity Agreement and provide security in this circumstance because the incumbent transmission owner and at least one nonincumbent transmission developer competed during the competitive proposal window before PJM determined the cost allocation for the project, and the same requirements must apply to all transmission developers to ensure comparability.

110.    We, therefore, find under FPA section 206 that the appropriate just and reasonable replacement rate will be achieved by directing PJM to amend the Operating Agreement to include provisions stating that no security requirement will be imposed on incumbent transmission owners where they have been designated as Designated Entities for PJM-chosen unsponsored projects or incumbent-proposal only projects.  Such provisions shall be effective the day after the date of this order.[268]  PJM is required to submit a compliance filing within 30 days of the date of issuance of this order revising Schedule 6 of the Operating Agreement (and, if necessary, the *pro forma* Designated Entity Agreement in the Tariff) to include such provisions.

### iv.    **Refund Effective Date**

111.    Section 206(b) of the FPA provides that upon the filing of a complaint, the Commission must establish a refund effective date that is no earlier than the date of the

---

[266] *See* PJM Answer to Complaint in EL22-80-00, at 9 (reiterating contention that the scope of Order No. 1000 is limited to transmission projects that are selected through PJM's competitive window process and included in the RTEP for purposes of cost allocation).

[267] *See* PJM Interconnection, L.L.C., Intra-PJM Tariffs, OA, Schedule 6 Sec 1.5 (28.0.0), § 1.5.8(a)-(e); s*ee also id.* § 1.5.8(m)(2).

[268] *See, e.g.*, *PJM Interconnection, L.L.C.*, 180 FERC ¶ 61,120, at P 16 (2022) (setting effective date for mandated tariff revisions as of the date of the order).

complaint and no later than five months subsequent to the date of the complaint. In such cases, in order to give maximum protection to customers, and consistent with Commission precedent, the Commission has historically tended to establish the section 206 refund effective date at the earliest date allowed by FPA section 206, and we do so here as well.[269] That date is the date on which PJM made the PJM 206 Filing, which was August 26, 2022.

112.    We decline, however, to order refunds pursuant to FPA section 206.[270] Our finding on the PJM 206 Filing relates to the requirement to provide Designated Entity Agreement-related security for PJM-chosen unsponsored projects and incumbent-proposal only projects. Although PJM holds cash security or requires a letter of credit for the duration of a Designated Entity Agreement, absent default, Designated Entities do not permanently transfer security to PJM. Once a project enters service, PJM returns any cash security and the obligation to provide a letter of credit ends. Moreover, there is nothing in the record that addresses what would be refunded, or how PJM would calculate those amounts.

### 3.    Compliance and Remedial Issues

113.    We now turn to arguments addressing the appropriate remedial actions that the Commission should take. As noted above, we find that PJM has violated the Operating Agreement (i.e., the relevant rate on file) because PJM did not execute Designated Entity Agreements in all situations required by the Operating Agreement.

### a.    Pleadings and Comments Summary

114.    Complainants request that the Commission immediately direct PJM to comply with the Operating Agreement's requirement that Designated Entities, whether incumbent transmission owners or nonincumbent transmission developers, must execute a Designated Entity Agreement.[271] Specifically, Complainants request that the Commission require that PJM: (1) execute Designated Entity Agreements for all previously approved RTEP projects that are under construction (i.e., for which facilities are not yet in service); and (2) execute Designated Entity Agreements for all applicable

---

[269] *See, e.g.*, *Idaho Power Co*., 145 FERC ¶ 61,122 (2013); *Canal Elec. Co*., 46 FERC ¶ 61,153, *order on reh'g*, 47 FERC ¶ 61,275 (1989).

[270] *See XO Energy MA, LP v. FERC*, 77 F.4th 710, 716-717 (D.C. Cir. 2023); *see also Towns of Concord v. FERC*, 955 F.2d 67, 72-73 (D.C. Cir. 1992).

[271] Complaint at 3, 24.

RTEP projects going forward.[272]  As to the first category of projects, Complainants estimate that approximately 494 RTEP projects would be affected, as of the time of filing.[273]  According to Complainants, PJM has not retained millions of dollars in associated security for these in-progress RTEP projects.[274]

115.   LSP Transmission requests that the Commission grant the Complaint and require PJM to execute outstanding Designated Entity Agreements within 105 days of the Commission's order, in line with the timeline set forth in Schedule 6, section 1.5.8(j) of the Operating Agreement.[275]

116.   In contrast, ITOs assert that accepting PJM's 206 Filing and its proposed replacement rate would avoid further controversy that interferes with cost-effective RTEP implementation.[276]  But, if the Commission grants the Complaint, ITOs request that the Commission exercise its remedial discretion to apply Designated Entity Agreement requirements to all applicable RTEP projects only prospectively.[277]

**b.    Commission Determination**

117.   Since we have found that PJM failed to comply with its Operating Agreement, we must consider whether to require any remedial action of PJM.[278]  The record indicates that there may potentially be hundreds of instances of non-compliance, i.e., circumstances in which the Operating Agreement required a Designated Entity Agreement but that PJM did not execute one, that may need to be addressed.

118.   First, because Designated Entity Agreements set forth rights and responsibilities during the period between a Designated Entity's accepting its designation by the PJM Board and the date on which the related RTEP project enters service,[279] we will not

---

[272] *See id.* at 3, 25.

[273] *See id.* at 3 & n.8.

[274] *See id.* at 23-24.

[275] LSP Transmission Comments, Docket No. EL22-80-000, at 5.

[276] ITOs Comments on PJM 206 Filing at 3, 11, 17-18.

[277] ITOs Comments on Complaint, Docket No. EL22-80-000, at 22-23.

[278] *See Radford's Run Wind Farm LLC v. PJM Interconnection, L.L.C.*, 171 FERC ¶ 61,025, at P 27 (2020); *XO Energy MA, LP v. FERC*, 77 F.4th 710 (D.C. Cir. 2023).

[279] *See* 2019 DEA Rehearing Order, 168 FERC ¶ 61,121 at P 6 (explaining that a "Designated Entity Agreement terminates once construction is complete and the

require PJM to execute a Designated Entity Agreement for any RTEP project that has already entered into service as of the date of this order, whether or not that project should have been subject to a Designated Entity Agreement during project development (past RTEP projects). For these past RTEP projects, any Designated Entity Agreement would have already expired. Thus, we find that requiring PJM to execute an agreement with the relevant parties now would provide little to no benefit.

119. Second, because we have found that imposing Designated Entity Agreement-related security requirements on PJM-chosen unsponsored projects and incumbent-proposal only projects is unjust and unreasonable, we see no reason to impose this requirement on Designated Entities for projects of either type that are currently in progress, but for which there is no executed Designated Entity Agreement.

120. Third, aside from that limited determination as to Designated Entity Agreement-related security requirements, we find that the current record does not yet provide a basis on which to determine whether, and if so, how, to exercise our discretion with respect to projects that are currently in progress but for which there is no executed Designated Entity Agreement (in-progress RTEP projects). As noted, it is possible that PJM has not executed a Designated Entity Agreement for a substantial number of in-progress RTEP projects. But because executing Designated Entity Agreements now may impose costs and because these in-progress RTEP projects may be at various stages of development, we require additional information as to whether imposing any remedy for PJM's Operating Agreement violations is warranted now.[280]

---

Designated Entity has met all of the requirements in Section 2.1 of the Designated Entity Agreement, including, for a Designated Entity that is not already a Transmission Owner, execution of the Consolidated Transmission Owners Agreement"); *see also* PJM, Intra-PJM Tariffs, OA Schedule 6 Sec 1.5 (28.0.0), § 1.5.8(j) (Acceptance of Designation) (explaining that a "development schedule . . . shall include . . . milestones necessary to develop and construct the project to achieve the required in-service date" (emphasis added)).

[280] The parties take different positions on the requirements for in-progress RTEP Projects that the Commission should direct in this order. The Complaint requests that all in-progress RTEP project developers be required to execute Designated Entity Agreements immediately and reasons that PJM's violations of the Operating Agreement are ongoing, while ITOs argue in the alternative that the Commission should use its remedial discretion to only apply additional Designated Entity Agreement requirements prospectively. *Compare* Complaint at 3, 25, *with* ITOs Comments on Complaint at 22-23. Absent more information on the scope of the Designated Entity Agreements that PJM may need to execute after the issuance of this order and potential administrative

121.    To fully consider these issues, we establish paper hearing procedures and pose the questions set forth in this order's appendix.  PJM is directed to respond to Question 1 within 45 days of the date of this order.  Then, all parties, including PJM, may submit initial comments that respond to the remaining questions and comment on PJM's responses to Question 1 within 75 days of the date of this order.

The Commission orders:

    (A)    The Complaint is hereby granted, in part, and denied, in part, as discussed in the body of this order.

    (B)    The PJM 206 Filing is hereby granted, in part, and denied, in part, as discussed in the body of this order.

    (C)    PJM is hereby directed to submit a compliance filing within 30 days of the date of issuance of this order to remove the security requirements from PJM-chosen unsponsored projects and incumbent-proposal only projects, to become effective the day after the date of this order, as discussed in the body of this order.

    (D)    Pursuant to the authority contained in and subject to the jurisdiction conferred on the Federal Energy Regulatory Commission by section 402(a) of the Department of Energy Organization Act and the FPA, particularly section 206 thereof, and pursuant to the Commission's Rules of Practice and Procedure and the regulations under the FPA (18 C.F.R. Chapter I), the Commission is instituting paper hearing procedures to address which in-progress projects must comply with the Operating Agreement's requirement to execute a Designated Entity Agreement, as discussed in the body of this order.

---

burdens associated with their execution, the record here is insufficient to decide whether (and, if so, what) exemptions should be provided.

Document Accession #: 20240725-3020      Filed Date: 07/25/2024

    (E)    The refund effective date in Docket No. EL22-85-000 shall be August 26, 2022, the date of the PJM 206 Filing.

By the Commission.  Commissioner See is not participating.
                       Commissioner Chang is not participating.

( S E A L )

                              Debbie-Anne A. Reese,
                              Acting Secretary.

Docket Nos. EL22-80-000 and EL22-85-000                                      - 69 -

## **Appendix**

1.    *For PJM response within 45 days*: Please provide the following information regarding in-progress RTEP projects that are subject to Designated Entity Agreements based on the findings of this order:

    a.    The number of in-progress RTEP projects broken down by project type, by RTEP annual cycle, or PJM Board approval date, and by stage of development or development milestone.[281]

    b.    An explanation of the actions or steps required to execute Designated Entity Agreements for each category or sub-type identified in response to Question 1(a) above.

    c.    An estimate of the anticipated administrative costs and time required to execute Designated Entity Agreements for all in-progress RTEP projects, and for each category or sub-type identified in response to Question 1(a) above.

    d.    An estimate of the number of non-conforming Designated Entity Agreements that may be filed with the Commission for all in-progress RTEP projects, for each category or sub-type identified in response to Question 1(a) above.

    e.    An assessment of whether any changes to the *pro forma* Designated Entity Agreement could lessen filing burdens for newly executed Designated Entity Agreements for in-progress RTEP projects.

    f.    Any further information that may be useful in determining whether PJM and the Designated Entities for the in-progress RTEP projects identified in response to this Question should be required to execute Designated Entity Agreements.

2.    *For all parties' responses within 75 days*:  Please identify and explain your position and any relevant proposals or considerations relating to whether PJM and the Designated Entities for the in-progress RTEP projects identified in PJM's response to Question 1 should be required to execute Designated Entity Agreements.  In addition, please answer:

---

[281] PJM is encouraged to summarize this information in tabular or graphical form, as appropriate.

a. Whether, and if so, how, entities beyond the parties to Designated Entity Agreements, such as transmission customers, stakeholders, and the public would derive value from the Commission requiring that incumbent transmission owners of in-progress RTEP projects sign Designated Entity Agreements.

b. If the Commission were to require incumbent transmission owners to sign Designated Entity Agreements for in-progress RTEP projects, whether there would be any benefit, including to the transmission customers that will ultimately pay such costs, in requiring that security be provided at this point for in-progress RTEP projects.

c. Whether among in-progress RTEP projects there are reasonable distinctions (e.g., by project type, approval date, progress towards completion, or administrative cost and burden for agreement execution) between those that should be required to have executed Designated Entity Agreements and those that should not.

d. Why and how does your position strike an appropriate balance between the benefits and the costs of executing Designated Entity Agreements for in-progress RTEP projects?

Document Content(s)

EL22-80-000.docx......................................................1

**EXHIBIT B**

188 FERC ¶ 62,155
UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

| | |
|---|---|
| American Municipal Power, Inc., Office of the People's Counsel for the District of Columbia, and the PJM Industrial Customer Coalition | Docket Nos. EL22-80-001 |
| v. | |
| PJM Interconnection, L.L.C.; | EL22-85-001 |
| PJM Interconnection, L.L.C. | |

NOTICE OF DENIAL OF REHEARING BY OPERATION OF LAW AND
PROVIDING FOR FURTHER CONSIDERATION

(September 26, 2024)

Rehearing has been timely requested of the Commission's order issued on July 25, 2024, in this proceeding. *American Municipal Power, Inc. v. PJM Interconnection, L.L.C.*, 188 FERC ¶ 61,055 (2024). In the absence of Commission action on a request for rehearing within 30 days from the date it is filed, the request for rehearing may be deemed to have been denied. 16 U.S.C. § 825*l*(a); 18 C.F.R. § 385.713 (2024); *Allegheny Def. Project v. FERC*, 964 F.3d 1 (D.C. Cir. 2020) (en banc).

As provided in 16 U.S.C. § 825*l*(a), the request for rehearing of the above-cited order filed in this proceeding will be addressed in a future order to be issued consistent with the requirements of such section. As also provided in 16 U.S.C. § 825*l*(a), the Commission may modify or set aside its above-cited order, in whole or in part, in such manner as it shall deem proper.

Debbie-Anne A. Reese,
Acting Secretary.

Document Content(s)

EL22-80-001.docx.......................................................1